UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 FEB -3 PM 2:43

CLERK
BY _____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 5:13-cr-50 |
| ) | |
| CHRISTOPHER WILLIAMS ) | |

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS
(Doc. 17)

This matter came before the court on December 10, 2013 for an evidentiary hearing on Defendant Christopher Williams's motion to suppress. (Doc. 17.) The parties completed post-hearing briefing on January 9, 2014, at which point the court took the matter under advisement.

Defendant is charged in a one count indictment with knowingly and intentionally distributing heroin in violation of 21 U.S.C. § 841(a)(1). Defendant seeks suppression of all evidence discovered after police seized and searched his cell phones following a traffic stop of a vehicle in which Defendant was a passenger. Defendant argues that the evidence is the fruit of an unconstitutional traffic stop, and that even if the traffic stop, and his ensuing arrest were lawful, the warrantless search of his cell phones was not permissible under any exception to the Fourth Amendment's warrant requirement.

The government opposes the motion, contending that the vehicle was properly stopped for a motor vehicle violation, and, assuming *arguendo* that the traffic stop was unlawful, Defendant committed a distinct crime subsequent to the stop that justified his continued detention. The government further contends that Defendant consented to a subsequent search of his cell phones, with the advice of his counsel, thus purging the evidence of any potential taint.

Defendant also seeks to suppress inculpatory statements he made while in custody awaiting the execution of a search warrant, arguing that they were the result of custodial interrogation without the benefit of *Miranda* warnings. As the government does not intend to use the challenged statements against Defendant in its case-in-chief, this portion of Defendant's suppression motion is moot.

The government is represented by Assistant United States Attorney ("AUSA") Michael P. Drescher. Defendant is represented by Lisa B. Shelkrot, Esq.

I.  **Findings of Fact.**

On the afternoon of February 7, 2013, Vermont State Police ("VSP") Trooper Michael Studin was travelling northbound on Interstate 91("I-91") in Vermont when he stopped a motorist for an alleged violation of 23 V.S.A. § 1038, which requires that vehicles remain entirely in a single lane "as nearly as practicable." In the location of the traffic stop, I-91 is a two-laned highway which is separated from two lanes of southbound traffic by a large median. There was light traffic on the day in question and the weather and pavement were clear.

Trooper Studin was driving in the passing lane when he approached a vehicle with out-of-state plates which he recognized as a rental car by the placard in its rear window and because the make and model of the vehicle were typical for a rental car. He observed the vehicle "coming close to the dotted center line," (Tr. 12/10/13 ("Tr.") at 8), and maneuvered his cruiser behind the vehicle. Shortly thereafter, he purportedly observed the vehicle cross the passing lane demarcation and initiated a traffic stop on that basis. At the time, there was no other traffic with which the target vehicle could potentially collide.

The government introduced into evidence a screen shot of the alleged violation taken from the cruiser's dashboard video camera which depicts the target vehicle's left, driver's side wheels touching the passing lane demarcation.[1] Trooper Studin conceded

---

[1] The government contends in its post-hearing brief that, "[e]ven if the vehicle's tires were only on the center line, then the vehicle's mirror would be outside the lane the vehicle had been traveling in." (Doc. 25 at 1 n.1.) The government erroneously describes the vehicle as crossing

that merely touching a line is not a motor vehicle violation. (Tr. at 32.) Although he testified that the target vehicle "weaved out of the lane and then proceeded to travel back into the same lane," (Tr. at 11), the cruiser's camera depicts no erratic driving by the vehicle prior to the stop.[2]

After effecting the stop, Trooper Studin exited his cruiser, approached the passenger side of the vehicle, and observed that the vehicle was occupied by two males. Defendant was the passenger and was seated in the front of the vehicle with the driver. Trooper Studin asked the driver for his identification and asked to whom the vehicle was registered. The driver provided a New York driver's license and advised the vehicle was rented by his passenger's girlfriend. During this initial exchange, Trooper Studin noticed "an overwhelming odor of burnt marijuana coming from the car" and observed "flakes of marijuana" on the Defendant's clothing and on the floor. (Tr. at 12.) Trooper Studin asked whether they had been smoking marijuana in the car, and the Defendant stated that they had "rolled a blunt" and smoked it as they were traveling north. Trooper Studin asked about the purpose of their trip. In response, Defendant explained that he was confined to a wheelchair and that they were traveling to Saint Albans, Vermont to retrieve a wheelchair for his use. Trooper Studin asked for identification from the Defendant, who denied having photo identification but stated that his name was "Christian Wilson." Trooper Studin then explained to the men that he stopped the vehicle because it had "drifted into the other lane." (Gov't Ex. 2 (cruiser videotape)). The driver explained that he was considering changing lanes but decided not to.

Following this exchange, Trooper Studin ordered the driver out of the vehicle. The driver consented to a search of his person and was then placed in the front seat of the

---

the "centerline," which would be a violation of 23 V.S.A. § 1031. Here, it is undisputed that any motor vehicle violation is governed by 23 V.S.A. § 1038. The government cites no precedent for a motor vehicle stop based upon the driver's side mirror encroaching upon a passing lane in which there is no traffic.

[2] A court may credit video footage over a witness's recollection of events. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (disregarding the lower court's version of the events to the extent the court failed to "view[] the facts in the light depicted by the videotape").

cruiser. In response to questions, the driver advised that he and his passenger were from New York and reiterated that the purpose of the trip was a brief stop to pick up a wheelchair. The driver further advised that the marijuana belonged to Defendant. Trooper Studin then asked for the driver's consent to search the vehicle. The driver consented to the search, but stated that Trooper Studin should request the Defendant's consent as well because the Defendant's girlfriend had rented it.

VSP Sergeant Eric Albright arrived to assist with the traffic stop. After Trooper Studin advised him of the situation and provided a physical description of the two men, Sergeant Albright stated he had received an email describing an individual "from the New York City area that was traveling to the St. Albans area who was confined to a wheelchair." (Tr. at 23.) He retrieved the email, which provided a physical description that matched the passenger and identified the person as Christopher Williams. As a result of these facts, Trooper Studin determined that the passenger had provided a false name and was actually the Defendant.

At approximately 4:15 p.m., Trooper Studin went back to the vehicle and obtained Defendant's written consent for a search of the vehicle. Defendant signed the consent form as "Christian Wilson" and stated that the marijuana belonged to the driver. Trooper Studin helped Defendant to exit and instructed him to leave his cell phone in the vehicle. Thereafter, law enforcement searched the vehicle's interior and discovered three cell phones: two iPhones and a flip phone. Defendant claimed ownership of all three phones and did not consent to a search of them at that time.

After law enforcement completed its search of the vehicle, Trooper Studin confronted Defendant with the information obtained from the email and Defendant admitted his true identity. The driver was given a written warning for violating 23 V.S.A. § 1038. Defendant and the driver were subsequently detained and transported to VSP's Brattleboro barracks.

At the barracks, Defendant was searched and law enforcement discovered marijuana on his person. Trooper Studin processed Defendant's cell phones and observed multiple incriminating text messages stored therein. Trooper Studin reported

that he did not manipulate the cell phones in order to access the messages as they were "clearly visible on the screen . . . without having to do anything to them." (Tr. at 27.) This was a result of a notification system built into the iPhones that automatically displays missed calls and text messages on the main screen even when the phone is password protected and locked. Trooper Studin testified that the iPhone screens should have been dark because they had not been in use for an extended period of time and he was unsure how the screens became illuminated such that the messages were visible. As for the flip phone, Trooper Studin opened the phone to determine whether it was on, at which point he observed additional messages. Trooper Studin did not take photographs of the text messages, but took notes and incorporated them into his report.

Law enforcement contacted Detective Matthew Plunkett with the Northern Vermont Drug Task Force who reported that he had conducted a controlled purchase of heroin from Defendant approximately nine months prior to the traffic stop as part of a federal investigation. Thereafter, a decision was made to charge Defendant for the prior sale of heroin. Defendant was formally arrested for that crime within an hour or two of the traffic stop.

After his arrest, Defendant was transported to a correctional facility where Detective Plunkett took custody of his three cell phones. Detective Plunkett pressed the power button on the iPhones to illuminate the screens and photographed the incriminating messages, but was unable to search the iPhones further as they were password protected. Detective Plunkett also searched the flip phone, which was not password protected, and reviewed its text messages and call log. The messages discovered "had [evidentiary] value where people were talking about stuff that [Detective Plunkett] believed to be drugs." (Tr. at 48.)

On February 8, 2013, Defendant appeared before a magistrate judge and was charged federally with the May 29, 2012 distribution of heroin. Believing that Defendant may have concealed narcotics in his anal cavity, law enforcement obtained a search warrant to examine Defendant's body, using evidence obtained from law enforcement's initial searches of Defendant's cell phones in its warrant application. Following

5

Defendant's initial appearance, the magistrate judge authorized agents from the Drug Enforcement Agency to take Defendant into custody for the execution of the search warrant at a local hospital. While in custody at the hospital, Defendant "expressed interest in cooperating with law enforcement." (Tr. at 56.) No further contraband was ultimately recovered from Defendant as a result of the search warrant.

On the morning of February 11, 2013, AUSA Drescher contacted Defendant's counsel and advised her that it was his understanding that Defendant might be interested in cooperating. Additional discussions led to a proffer session conducted at the United States Attorney's Office on February 12, 2013 which included Defendant, his counsel, AUSA Drescher, AUSA Christina Nolan, and several members of law enforcement.

In light of Defendant's expression of interest in possible cooperation, the United States Attorney's Office asked for Defendant's consent to conduct a full search of his cell phones without the protection of a standard proffer letter. Defendant consulted with his attorney, and he consented to the search under those terms. Defendant provided the passwords for his two iPhones, which were searched and subsequently returned to Defendant. That same day, the government moved to dismiss the federal complaint against Defendant without prejudice with the expectation that he would cooperate further. The government's motion was granted, the complaint was dismissed, and Defendant was released from custody. Thereafter, on April 11, 2013, Defendant was again indicted for the May 29, 2012 distribution of heroin.

## II.  Conclusions of Law and Analysis.

### A.  The Legality of the Traffic Stop.

Defendant contends that the traffic stop of the vehicle in which he was travelling was unlawful because touching the passing lane on a public highway does not constitute a motor vehicle violation under Vermont law. The government disagrees and argues that the stop was justified because Trooper Studin had reasonable suspicion that the vehicle crossed the line in violation of 23 V.S.A. § 1038.

"[R]easonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop." *United States v.*

*Stewart*, 551 F.3d 187, 193 (2d Cir. 2009). In determining whether an officer has reasonable suspicion that a motor vehicle violation has taken place, he or she must have more than an "inchoate and unparticularized suspicion or hunch" that criminal activity is imminent, but the stop does not require proof of wrongdoing by "a preponderance of the evidence." *United States v. Elmore*, 482 F.3d 172, 178-79 (2d Cir. 2007) (internal quotation marks omitted) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "Evidence seized based on an unreasonable traffic stop is subject to the fruit of the poisonous tree doctrine, and may be suppressed." *United States v. Harrell*, 268 F.3d 141, 148 (2d Cir. 2001) (internal quotation marks omitted).

Vermont law provides in relevant part that, "[a] vehicle shall only be driven, *as nearly as practicable*, entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with *safety*." 23 V.S.A. § 1038(a) (emphasis supplied). In construing a statute, Vermont courts "aim to implement the intent of the Legislature and will presume the Legislature intended the plain, ordinary meaning of the statute." *Pease v. Windsor Dev. Review Bd.*, 2011 VT 103, ¶ 17, 190 Vt. 639, 35 A.3d 1019) (internal quotation marks omitted). When construing motor vehicle statutes, the Vermont Supreme Court has noted that "even a violation of a statute that 'is often violated and impossible to comply with' may lead to reasonable suspicion that justifies a stop, because the impossibility of compliance is 'ultimately for the Legislature to address, not this Court.'" *State v. Tuma*, 2013 VT 70, ¶ 8, 79 A.3d 883 (quoting *State v. Fletcher*, 2010 VT 27, ¶ 12, 187 Vt. 632, 996 A.2d 213). "At the same time, however, [courts] do not construe statutes in such a way as to lead to absurd or irrational results." *Id.* (internal quotation marks omitted) (holding slightly crooked license plate did not violate Vermont statute requiring plates to be maintained "horizontal" because angle did not render it difficult to read).

"Under a long line of [Supreme Court] decisions, the tie must go to the defendant" when determining whether conduct is criminalized by an ambiguous statute. *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion). As the Supreme Court has explained:

7

> The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce [the legislative branch] to speak more clearly and keeps courts from making criminal law in [the legislature's] stead.

*Id.* (citations omitted); *Sash v. Zenk*, 439 F.3d 61, 64 (2d Cir. 2006) (explaining that "the rule of lenity tips the scales in favor of the defendant"); *see also Kolender v. Lawson*, 461 U.S. 352, 361 (1983) (holding state criminal statute "unconstitutionally vague on its face because it encourages arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute").

The Vermont Supreme Court has addressed section 1038 in two, nonbinding entry orders. In *State v. Bedell*, 2011 WL 6003859 (Vt. Nov. 9, 2011), the court affirmed the trial court's conclusion that an officer had reasonable suspicion to stop a defendant for violating section 1038 on the basis of the officer's undisputed testimony that he "observed defendant cross the *centerline* of the road," which was "borne out by a video-recording of the stop." *Id.* at *1-2 (emphasis supplied). Under Vermont law, crossing the center line to any degree is prohibited by 23 V.S.A. § 1031 unless the vehicle is turning. *See State v. Marshall*, 2010 VT 81, ¶¶ 6, 9, 188 Vt. 640, 8 A.3d 1086 (entry order) (holding that crossing the center line in violation of the "drive to the right" statute justified traffic stop, regardless of the duration and degree of the violation).

In *State v. McTigue*, 2007 WL 5313441 (Vt. Oct. 1, 2007), the Vermont Supreme Court declined to interpret section 1038 because the stop at issue was independently supported by an overall pattern of erratic driving suggesting that the driver was under the influence. *Id.* at *2. Neither *McTigue* nor *Bedell* addressed whether touching a passing lane demarcation in the absence of a safety concern constitutes a motor vehicle violation.

Some Vermont trial courts have held that merely making contact with a highway marking is not a violation of section 1038. For example, in *State v. Bleau*, No. 4952-12-12 Cncr (Vt. Super. Ct. May 28, 2013) (Griffin, J.), "[t]he sole reason for the initial stop

of Defendant's vehicle was the alleged momentary striking of the fog line over a distance of approximately 8/10 of a mile." *Id.* at 3. The driver was later charged with driving under the influence. The court granted the defendant's motion to suppress, holding that "a momentary contact with a fog line is not a motor vehicle infraction." *Id.* at 2. Focusing on the qualifier "as nearly as practicable," the court explained that "the statute recognizes that during the course of travel, there might be times when our vehicles may not be driven entirely within a single lane." *Id.* at 3.

Similarly, in *State v. Beaulieu*, No. 2923-7-11 CnCr (Vt. Super. Ct. Nov. 18, 2011) (Crucitti, J.), the court held that:

> A review of the cruiser video shows that the defendant crossed the fog line on two separate occasions as he negotiated two separate curves. The court believes that the intent of 1038(1) through (4), read as a whole, are designed to ensure safety of vehicles on multiple lane highways. Viewed in this context, the defendant's operation does not appear to fall within the prohibition of this section. The defendant did not attempt to travel from within his lane or move from the lane in a manner that was unsafe.

*Id.* at 1-2; *see also State v. Savery*, No. 51-5-13 Rdcs, at 3 (Vt. Super. Ct. Aug. 13, 2013) (C. Corsonses, J.) (finding touching, but not crossing, the center line does not violate 23 V.S.A. § 1031 which prohibits crossing the center line unless turning); *State v. Chompupong*, No. 843-2-03 at 1 (Vt. Dist. Ct. August 27, 2003) (Burgess, J.) (ruling that a violation of statute prohibiting crossing of centerline does not occur where the alleged infraction consists of "[t]he slight encroachment of defendant's car into the passing lane [which] seem[s] little different than what is commonly observed of numerous cars traveling the interstate and other highways with two lanes in the same direction").

Vermont's trial court decisions are consistent with those of other jurisdictions "interpreting similar, if not identical," statutory language "[holding] that touching the line is not enough to constitute [a motor vehicle violation]." *United States v. Colin*, 314 F.3d 439, 444 (9th Cir. 2002) (ruling that "to violate a lane straddling statute, a driver must do more than simply touch, even for 10 seconds, a painted line on a highway" and "[t]ouching a dividing line, even if a small portion of the body of the car veers into a neighboring lane, satisfies the statute's requirement that a driver drive as 'nearly as

9

practical entirely within a single lane.'"); *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) ("We can not, however, agree that one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time constitutes a failure to keep the vehicle within a single lane 'as nearly as practicable.'"); *United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996) (finding that an isolated incident of a vehicle crossing into the emergency lane does not violate statute's requirement that vehicles remain entirely in a single lane "as nearly as practical"); *United States v. Sugar*, 322 F. Supp. 2d 85, 91 (D. Mass. 2004) (noting that "the phrase 'as nearly as practicable' indicates that the statute was not intended to comprehend minor swerving"); *United States v. Guevara-Martinez*, 2000 WL 33593291, at *2 (D. Neb. May 26, 2000) (concluding that touching, but not crossing, the dotted line between two southbound lanes twice in a half mile did not violate the statute's "near as practicable" requirement); *Rowe v. State of Maryland*, 769 A.2d 879, 885, 889 (Md. 2001) (interpreting nearly identical statute and observing that "more than the integrity of the lane markings, the purpose of the statute is to promote safety on laned roadways" and thus the "momentary crossing of the edge line of the roadway and later touching of that line" was not reasonable suspicion to justify traffic stop); *State v. Caron*, 534 A.2d 978, 979 (Me. 1987) (finding no reasonable suspicion to justify a traffic stop because a "vehicle's brief, one time straddling of the center line of an undivided highway is a common occurrence"); *State v. Tarvin*, 972 S.W.2d 910, 912 (Tex. Ct. App. 1998) (concluding that police officer did not have reasonable suspicion to stop the defendant's vehicle merely because the defendant's car "touch[ed] the right-hand white line").

  Accordingly, the court finds that, under Vermont law, momentarily touching a passing lane demarcation with no risk to public safety does not give rise to a failure to "remain entirely" in a single lane "as nearly as practicable." 23 V.S.A. § 1038. A contrary interpretation would authorize random stops, penalizes routine operation, and "lead to absurd or irrational results." *Tuma*, 2013 VT 70, ¶ 8, (internal quotation marks omitted). Because Trooper Studin's stop of the motor vehicle in which Defendant was travelling was unlawful, Defendant was seized in violation of the Fourth Amendment.

*See Colin*, 314 F.3d at 444, 446 (holding occupants of vehicle were unlawfully seized under the Fourth Amendment when law enforcement stopped the vehicle for touching the center line and fog line because such movement did not provide a reasonable suspicion of a traffic violation).

### B. The Vehicle Search and Seizure of Defendant's Cell Phones.

At the traffic stop, Trooper Studin smelled burnt marijuana emanating from the vehicle and Defendant admitted that the occupants had recently smoked a marijuana cigar. Trooper Studin thereafter obtained both the driver and Defendant's consent to search the vehicle. When an individual's consent to a search of his or her person or property follows an illegal seizure, "the evidence obtained from the search must ordinarily be suppressed unless the [g]overnment shows both that the consent was voluntary *and* that 'the taint of the initial [seizure] has been dissipated.'" *United States v. Murphy*, 703 F.3d 182, 190 (2d Cir. 2012) (alteration in original) (quoting *United States v. Snype*, 441 F.3d 119, 132 (2d Cir. 2006)).

Defendant's consent to the search of the vehicle occurred shortly after his illegal seizure with no intervening events. *See id.* at 190-92 (holding the defendant's consent to search was tainted by unlawful stop where less than one minute elapsed between the end of the fifteen-minute stop and consent to search and there were no intervening circumstances sufficient to dissipate the taint); *see also Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (suppressing confession where there was "no indication from the record that any substantial time passed" between unlawful arrest and confession). The government argues that even if the traffic stop was unconstitutional and Defendant's consent to search was tainted by that illegality, law enforcement remained justified in detaining Defendant and searching the vehicle because law enforcement's collective knowledge established probable cause to arrest Defendant for the distribution of heroin.

Under the collective knowledge doctrine, "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the

11

investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001). In this case, although the government's witnesses made reference to an email containing information regarding Defendant, the email was not introduced into evidence and only described an individual "from the New York City area that was traveling to the St. Albans area who was confined to a wheelchair." Tr. at 23. The government proffered no evidence that either Trooper Studin or Detective Sergeant Albright was aware of any information regarding the alleged May 29, 2012 heroin distribution at the time of the stop. Because Defendant was formally arrested for the distribution of heroin an hour or two after the traffic stop, the record supports a conclusion that, at the time of the stop, Trooper Studin lacked probable cause to arrest Defendant for that crime. Accordingly, the collective knowledge doctrine does not apply. *See Loria v. Gorman*, 306 F.3d 1271, 1292 (2d Cir. 2002) ("An officer may arrest an individual based on a report by another officer only if reliance on that report is objectively reasonable."); *Wong v. Yoo*, 649 F. Supp. 2d 34, 60 n.11 (E.D.N.Y. 2009) ("While in some cases . . . facts supporting probable cause may be imputed from one officer to another, some amount of communication between officers is necessary in order for a second officer's reliance on the first officer's knowledge to be reasonable.") (internal citation omitted).

In the alternative, the government contends that Defendant's further detention and law enforcement's subsequent search of the vehicle were justified because Defendant provided a false name to law enforcement in violation of 13 V.S.A. § 1754(a) ("A person who knowingly gives false information to any law enforcement officer with purpose to implicate another or to deflect an investigation from the person or another person shall be imprisoned for not more than one year or fined not more than $1,000.00, or both.").

The Second Circuit has recognized that it would be "an unwarranted extension of [the fruit of the poisonous tree] doctrine to apply it . . . to a new wrong committed by the defendant." *United States v. Remington*, 208 F.2d 567, 570 (2d Cir. 1953). Accordingly, if a defendant's response to an illegal stop "'is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime,' and any evidence uncovered by a search incident to that arrest should not be suppressed as the 'fruit of the poisonous

12

tree' and is thus admissible against the defendant." *United States v. Bellamy*, 592 F. Supp. 2d 308, 322 (E.D.N.Y. 2009) (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982) (holding that a defendant's flight from an illegal arrest is a new crime for which the defendant may be constitutionally arrested and evidence obtained incident to arrest may be used at trial)); *see also United States v. Awadallah*, 349 F.3d 42, 81 n.8 (2d Cir. 2003) (Straub, J., concurring) ("Other circuits have likewise held that the fruit of the poisonous tree doctrine does not apply to new crimes committed by an individual who has been unlawfully detained.") (collecting cases).

As the Fourth Circuit explained, "[t]here is a strong policy reason for holding that a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest." *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997). A "'contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct.'" *Id.* (quoting *Bailey*, 691 F.2d at 1018); *see also Feathers v. Aey*, 319 F.3d 843, 852 n.2 (6th Cir. 2003) ("If the doctrine did cover such situations, an individual who is unconstitutionally seized would have license to commit any offense he or she desired and could not be arrested for it."). Accordingly, "[t]he exclusionary rule does not act as a bar to the prosecution of a crime where the statements themselves are the crime," *United States v. Melancon*, 662 F.3d 708, 712 (5th Cir. 2011), and therefore "[a] person believing himself illegally in captivity . . . may not lie in an effort to throw the police off the scent." *United States v. Pryor*, 32 F.3d 1192, 1195-96 (7th Cir. 1994).

Here, Defendant's continued detention was proper because he twice provided a false name to authorities in an effort to deflect an investigation of his activities. *Id.* (holding that evidence of a defendant's misrepresentation of his identity by using a false social security number during an allegedly illegal detention was admissible); *United States v. Garcia-Jordan*, 860 F.2d 159, 161 (5th Cir. 1988) (finding that false citizenship statements made after illegal traffic stop constituted a new offense and did not warrant suppression). The question thus becomes whether Defendant's commission of a new

13

crime and his subsequent arrest authorized a search of the vehicle in which he was travelling.

In *Arizona v. Gant*, 556 U.S. 332 (2009), the Supreme Court held that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Id.* at 343 (internal quotation marks omitted). In other words, searching a vehicle incident to arrest is appropriate where "the offense of arrest" supplies "a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Id.* (holding arrest for driving with a suspended license did not provide a basis for searching the defendant's vehicle).

The fact that Defendant was not actually arrested for providing false information to a police officer is of no consequence. In *Devenpeck v. Alford*, 543 U.S. 146 (2004), the Court held that the focus is on whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest. *Id.* at 153. The Court rejected the view that probable cause to arrest must be predicated upon the offense invoked by the arresting officer, or even upon an offense "closely related" to that offense. *Id.* In a similar fashion, the Second Circuit has articulated the relevant inquiry as "whether probable cause existed to arrest," clarifying that "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).

Taken together, *Gant* and *Devenpeck* establish that law enforcement can search a vehicle where the arresting officer has probable cause to arrest a defendant and an objectively reasonable belief that the vehicle in which the defendant was travelling contains evidence of the crime of arrest, regardless of whether the defendant was ultimately charged with that crime. *See United States v. Vinton*, 594 F.3d 14, 21-22, 26 (D.C. Cir. 2010) (finding that vehicle search was valid under *Gant* because it was reasonable to believe evidence of an uncharged crime would be discovered, where facts objectively supported arrest for the uncharged crime under *Devenpeck*); *see also* W.

14

LaFave, 3 Search & Seizure § 5.4(a) (5th ed. 2013) (explaining that, in the search incident to arrest context, "a *Devenpeck*-style reliance on probable cause of another offense seems just as legitimate regarding a post-search arrest as it unquestionably is for a pre-search arrest").[3]

At the time of the traffic stop, Trooper Studin had probable cause to arrest Defendant for providing false information to a police officer based upon Defendant identification of himself as "Christian Wilson" and an email identifying a man who matched Defendant's description and travel plans as "Christopher Williams." *See Jaegly*, 439 F.3d at 152 ("An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.") (internal quotation marks omitted). Searching the vehicle was thus proper under *Gant* because it was objectively reasonable to believe that evidence of Defendant's true identity may be discovered in the vehicle from items such as luggage tags, hotel invoices, credit cards, mail, or other documents bearing Defendant's name, even if law enforcement was more interested in evidence of other crimes. *See Florida v. Jardines*, 133 S. Ct. 1409, 1416 (2013) ("[A] stop or search *that is*

---

[3] Pre-*Gant* decisions also upheld searches incident to arrest based on an objective finding of probable cause for uncharged crimes. *See United States v. Coleman*, 458 F.3d 453, 458 (6th Cir. 2006) (holding it is "immaterial that [the defendant] was ultimately charged with an offense different than that which provided the legitimate probable cause justifying the search" of his vehicle incident to his arrest); *United States v. Bookhardt*, 277 F.3d 558, 556 (D.C. Cir. 2002) (explaining that "the [search incident to arrest] exception appl[ies] regardless of whether the officer articulates the wrong reason for making the arrest."); *United States v. Friedman*, 43 F. App'x 424, 426-27 (2d Cir. 2002) (finding vehicle search was incident to arrest even though "the car's occupants were not arrested until after the search," and "they were charged with unlawful possession of firearms (which firearms were seized in the course of the search), rather than with traffic violations which could have justified a pre-search arrest"); *United States v. Koron*, 1996 WL 197234, at *2 (2d Cir. 1996) (unpublished) ("Moreover, we have held that, as long as a police officer has probable cause to arrest a suspect prior to searching the suspect, the search will be valid, even if the officer initially had no intention of arresting the suspect."); *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) (holding that the authority to conduct a search incident to arrest vests "once the police ha[ve] probable cause to . . . arrest"); *United States v. Ricard*, 563 F.2d 45, 49 (2d Cir. 1977) (upholding search that preceded arrest where officer had probable cause to arrest for a traffic violation, "even if he initially determined not to do so").

*objectively reasonable* is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason."); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) (holding that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").

Because Trooper Studin "had probable cause to arrest before the search, the [search incident to arrest] exception applies regardless of whether [the] search 'occurred prior or subsequent to [the] arrest.'" *United States v. Williams*, 2012 WL 6567598, at *7 (D. Vt. Dec. 17, 2012) (quoting *United States v. Wilson*, 94 Fed. App'x. 14, 17 (2d Cir. 2004)); *see also Coleman*, 458 F.3d at 458 (finding it "immaterial that [the defendant] was not formally taken into custody until after his car was searched"); *United States v. Jenkins*, 496 F.2d 57, 73 (2d Cir. 1974) ("The mere fact that the trooper reversed the procedure, conducting the search before the arrest, did not render it illegal as long as probable cause to arrest existed at the time of the search."). The question is whether the "arrest followed shortly after the search." *United States v. McKissick*, 204 F.3d 1282, 1296 (10th Cir. 2000). In the instant case, Defendant's formal arrest for the distribution of heroin occurred within approximately an hour or two of the traffic stop and thus followed "shortly after the search." *Id.* Law enforcement's search of the vehicle and seizure of Defendant's cell phones thus occurred in the course of a lawful search incident to arrest.

### C. The Cell Phone Searches.

Defendant contends that law enforcement's post-arrest manipulation and inspection of his cell phones cannot be justified as part of a search incident to arrest because those searches lack a temporal proximity to his arrest and were not necessary for officer safety or to preserve evidence. He further argues that his subsequent consent to a search of his phones was tainted by the initial warrantless searches as well as by the use of evidence derived from the phones to obtain an intrusive search warrant of his body's cavities. Defendant points out that neither he nor his counsel was provided with information or discovery regarding the nature of the traffic stop and he was in continuous custody at the time his consent was obtained. The government counters that law

16

enforcement's initial searches of the cell phones' content were constitutional under *Gant*, or, in the alternative, Defendant's consent to a search of his phones five days after the initial search purged any conceivable taint.

The exclusionary rule generally subjects "[e]vidence obtained from an unlawful search or seizure . . . to exclusion" as fruit of the poisonous tree. *Mosby v. Senkowski*, 470 F.3d 515, 520 (2d Cir. 2006). The rule extends to both direct and indirect products of unconstitutional conduct, as well as consent obtained after an unlawful search. *Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963); *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990). A court should inquire whether, "granting [the] establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488 (internal quotation marks omitted). This inquiry "does not hinge on a simple 'but for' analysis, but rather, 'must be answered on the facts of each case.'" *United States v. Thompson*, 35 F.3d 100, 105 (2d Cir. 1994) (quoting *Brown v. Illinois*, 422 U.S. 590, 603 (1975)). "The relevant constitutional question is 'whether the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint.'" *Mosby*, 470 F.3d at 520 (quoting *United States v. Ceccolini*, 435 U.S. 268, 273-74 (1978)). "[F]our factors [are] relevant to the analysis: (1) whether *Miranda* warnings were given, (2) the temporal proximity of the prior illegal act to the consent, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." *Murphy*, 703 F.3d at 190 (internal quotations marks omitted).

Assuming *arguendo* that law enforcement's initial searches of Defendant's cell phones were unlawful, Defendant's subsequent consent to the search of the cell phones was voluntary and purged of any arguable taint. Upon his lodging at a correctional facility, Defendant expressed to law enforcement his desire to cooperate. In the five days that followed his arrest, Defendant appeared before a magistrate judge, was appointed experienced counsel, and was advised of his rights. At the proffer session, Defendant was accompanied by counsel and presented with the option of providing consent under

17

specific terms to which he and his counsel agreed.[4] He was not forced to consent to the search or to provide the passwords that would permit it to take place. Instead, his decision to cooperate was a tactical one that he initiated. These events and the passage of time diminish the temporal proximity of any illegal initial searches of his cell phones and constitute intervening circumstances that severed any causal connection between the initial search and Defendant's subsequent counseled consent. *See United States v. Shaw*, 464 F.3d 615, 630 (6th Cir. 2006) (noting that discussion with counsel is an example of an intervening circumstance that dissipates any taint); *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1300 (9th Cir. 1988) (explaining that "an appearance before a magistrate" or "discussions with a lawyer" are "examples of intervening circumstances that are sufficient to break the causal connection between the [unlawful] arrest and consent"); *Carnejo-Molina v. I.N.S.*, 649 F.2d 1145, 1149 (5th Cir. 1981) (finding "conferences of petitioner with counsel and his advice to her" an intervening circumstance that breaks the causal chain).

Moreover, again assuming *arguendo* that law enforcement unlawfully conducted initial searches of Defendant's cell phones, it did so only in a brief and cursory manner and in the context of a body of law governing the search of cell phones incident to arrest which is both in conflict and in flux.[5] The alleged official misconduct at issue was thus neither an intentional nor flagrant violation of Defendant's rights.

---

[4] Defendant could have conditioned his consent on the provision of certain discovery, including details regarding the traffic stop, but apparently chose not to do so.

[5] *Compare United States v. Wurie*, 728 F.3d 1, 13 (1st Cir. 2013) ("[T]he search-incident-to-arrest exception does not authorize the warrantless search of data on a cell phone seized from an arrestee's person"), *cert. granted*, 2013 WL 4402108 (U.S. Jan. 17, 2014), *and United States v. Mayo*, 2013 WL 5945802, at *13 (D. Vt. Nov. 6, 2013) ("[C]ell phones properly seized pursuant to the search-incident-to-arrest exception or the automobile exception cannot be searched without a warrant."), *with United States v. Flores-Lopez*, 670 F.3d 803, 810 (7th Cir. 2012) (upholding cell phone search for its phone number as incident to arrest, but questioning whether a more invasive search would be permissible), *and United States v. Murphy*, 552 F.3d 405, 411 (4th Cir. 2009) ("[O]fficers may retrieve text messages and other information from cell phones and pagers seized incident to an arrest."), *and Silvan W. v. Briggs*, 309 F. App'x 216, 225 (10th Cir. 2009) ("[T]he permissible scope of a search incident to arrest includes the contents of a cell

Because Defendant's consent to search his cell phones was an act of free will untainted by the prior search, the exclusionary rule does not apply. *See United States v. Weisman*, 624 F.2d 1118, 1126 (2d Cir. 1980) (holding "three-day lapse between statements" and "formal arraignment," the "opportunity to consult with counsel," and "the general lack of governmental intimidation," among other circumstances, were sufficient to dissipate taint of unlawful arrest). The court therefore DENIES Defendant's motion to suppress the cell phone evidence.

## CONCLUSION

For the foregoing reasons, the court hereby DENIES Defendant's motion to suppress. (Doc. 17.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 3rd day of February, 2014.

Christina Reiss, Chief Judge
United States District Court

---

phone found on the arrestee's person."), *and United States v. Finley*, 477 F.3d 250, 260 (5th Cir. 2007) (upholding search of the defendant's cell phone incident to arrest).