UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA     *
                             *
          V                  *
                             *
CHRISTOPHER WILLIAMS         *  CRIMINAL FILE NO. 13-50




SENTENCING
Tuesday, October 14, 2014
Burlington, Vermont



BEFORE:

      THE HONORABLE CHRISTINA R. REISS
         Chief District Judge


APPEARANCES:

      MICHAEL P. DRESCHER, ESQ., Assistant United States
         Attorney, Federal Building, Burlington, Vermont;
         Attorney for the United States

      LISA B. SHELKROT, ESQ., Langrock Sperry & Wool,
         LLP, 210 College Street, Burlington, Vermont;
         Attorney for the Defendant




ANNE NICHOLS PIERCE
Registered Professional Reporter
United States District Court
Post Office Box 5633
Burlington, Vermont  05402
(802) 860-2227

# **I N D E X**

### **E X A M I N A T I O N**

| WITNESS NAME | PAGE | LINE |
|---|---|---|
| **EDWIN BIGGS** | | |
| Direct by Mr. Drescher | 11 | 24 |
| Cross by Ms. Shelkrot | 25 | 4 |
| **DANIEL MERCHAND** | | |
| Direct by MS. SHELKROT | 55 | 8 |

1   TUESDAY, OCTOBER 14, 2014

2   (The following was held in open court at 2:49 p.m.)

3           COURTROOM DEPUTY:  Your Honor, the matter

4   before the Court is criminal case number 13-50, United

5   States of America versus Christopher Williams.

6   Representing the government is Assistant United States

7   Attorney Michael Drescher.  And the defendant is present

8   today with his attorney, Lisa Shelkrot.

9       And we are here for sentencing.

10          THE COURT:  Good afternoon.

11          MR. DRESCHER:  Good afternoon.

12          MS. SHELKROT:  Good afternoon, your Honor.

13          THE COURT:  I have read your sentencing

14   memoranda and the presentence report, and let me make

15   sure that, Mr. Williams, you have read the presentence

16   report as well?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Okay.  Let me -- we have lots of

19   objections, and I don't know how much has been resolved,

20   if anything.  So I am going to start with you, Miss

21   Shelkrot.  And are there any challenges to the factual

22   section of the presentence report?

23          MS. SHELKROT:  Yes, your Honor.  As I have

24   identified in my sentencing memorandum, we challenge

25   specifically the assertion that Mr. Knowlton was working

1     for -- was working for my client.  We challenge the

2     application of the firearm enhancement.  And I guess

3     this isn't really a factual piece of it; we challenge

4     the organizational -- organizer or leader enhancement

5     for four points for an application as a specific factual

6     issue.

7              THE COURT:  Okay.  And have I covered all of

8     your factual guideline issues then?

9              MS. SHELKROT:  I just want to make sure that I

10    am getting everything correct:  gun enhancement, the

11    leadership enhancement, and the drug quantity based on

12    Mr. Knowlton -- oh, also we would object to the

13    assertion that Jennifer Garay was also working for my

14    client, or that she performed a transaction for him.

15    It's not a dispute that has any guideline relevance, I

16    don't think, one way or the other.

17             THE COURT:  Well, in the supervisory role that

18    he has, if five or more participants; if you take out

19    Mr. Knowlton and Miss Garay, do we still have five or

20    more?

21             MS. SHELKROT:  I think there are still.

22             THE COURT:  Okay.  Okay.  And, Mr. Williams,

23    do you agree with your attorney's identification of

24    factual errors and guideline issues in the presentence

25    report?

1          THE DEFENDANT:  Yes.

2          THE COURT:  All right.  Let me turn to the

3    government.  And you had a challenge to drug quantity.

4    And are you still maintaining that challenge?

5          MR. DRESCHER:  Yes.

6          THE COURT:  Okay.  So any other challenges to

7    the presentence report from the government?

8          MR. DRESCHER:  No.

9          THE COURT:  Do you plan on putting on evidence

10   to prove up the drug quantity?

11         MR. DRESCHER:  I do.  I intend to call Edwin

12   Biggs.

13         THE COURT:  Okay.  And I hear, Miss Shelkrot,

14   you may have a witness as well?

15         MS. SHELKROT:  Yes, just Detective Merchand.

16         THE COURT:  Okay.  All right.  So the

17   government may call its first witness.

18         MS. SHELKROT:  Your Honor, just before the

19   government does call the witness, I'd like to state an

20   objection to what I understand to be the basis for

21   calling Mr. Biggs, which is to testify as to quantities

22   that he supplied to my client.

23       The basis for the government's objection, as set

24   forth in the presentence report and in the comments to

25   probation and to myself at the time of the draft, were

1  based on a dispute with the weight of the average bags.

2       It turns out, as far as I can tell, based on

3  Mr. Biggs' statement to the grand jury, that the weights

4  that the state police uses and that the probation report

5  uses seems to be exactly what Mr. Biggs would have said

6  himself, but there wasn't any information given to

7  probation or to the defense at the time the draft was

8  prepared and no -- no factual dispute based on different

9  activity; only based on the weight of the drugs that

10  were being supplied.

11       THE COURT:  Okay.  So, Mr. Drescher, you made

12  this objection.  I didn't see anything about

13  Mr. Biggs -- about that.  So how do we get there from

14  the objection that you did raise?

15       MR. DRESCHER:  So the objection is to the

16  quantity calculation.  I made clear to the author of the

17  PSR and to defense counsel that should we not resolve

18  the question of quantity, the government intended to

19  call Mr. Biggs, who, everybody agrees, was Mr. Williams'

20  source of supply.  I believe it is patent that if I am

21  calling the source of supply to the defendant, that the

22  topic of the testimony is going to be how much drugs

23  were supplied.  Mr. Biggs --

24       THE COURT:  Well, I am looking at your

25  objection, and it says, "This is based in part on their

1  position that the average bag weight of heroin should be

2  calculated at a higher level."  So that's fine.

3           MR. DRESCHER:  Sure.

4           THE COURT:  What else is he going to say?

5           MR. DRESCHER:  What else is how much heroin

6  passed through Mr. Williams into the people of Vermont.

7  The heroin that passed through Mr. Williams was supplied

8  by Mr. Biggs.

9           THE COURT:  So why not raise that with the

10  probation officer so that you alert your -- the Court

11  and your opposing counsel that drug quantity is

12  contested on that basis?

13           MR. DRESCHER:  So there's been -- there's been

14  no misunderstanding, I believe, that drug quantity was

15  being contested, that our -- if we were unable to

16  resolve the question of drug quantity, we intended to

17  call the defendant's source of supply.

18           THE COURT:  Okay, so I'm looking at your --

19           MR. DRESCHER:  If I -- if that was too

20  nuanced, I apologize.  I thought I was being obvious in

21  making my objection that -- to get to the bottom --

22  assuming your Honor credits Mr. Biggs -- and I

23  understand you may or may not, but to get to the bottom

24  of how much quantity Mr. Williams should be responsible

25  for, the people who know that are Mr. Williams and

1       Mr. Williams' source of supply.

2           I tried to make clear to everybody that if we

3       couldn't resolve the issue, this is how I intended to

4       make the record at sentencing.

5               THE COURT:  All right.  So back to you, Miss

6       Shelkrot.  In Mr. Drescher's sentencing memorandum, he

7       says, "The United States intends to present testimony at

8       Williams' sentencing to explain that the Court's

9       guideline analysis should incorporate a quantity in

10      excess of a kilogram.  Witnesses may include Williams'

11      source of supply.  With the presentation of this

12      testimony, the United States anticipates the hearing

13      could take two hours."

14              MS. SHELKROT:  Yes.  Your Honor, I don't

15      dispute that Mr. Drescher has had Edwin Biggs on the

16      witness list through the discovery period, and I don't

17      dispute that he said he might or would call Mr. Biggs as

18      a witness on quantity.

19          My concern is just what I raised to the Court and

20      what I think the Court zeroed in on, which is that the

21      nature of the objection that he raised was with respect

22      to the average bag weight.  There's quite a bit of

23      e-mail traffic back and forth during the objection

24      period, which was actually sort of extended here.  There

25      was -- because there was a whole complicated situation,

1    as the Court's aware, with the extensions of the
2    sentencing date.
3        Any way.  That draft objection period lasted for a
4    while, and there was quite a bit of correspondence back
5    and forth among the three -- three parties here.  And
6    from the government, it was all about specific lab
7    reports and the weight of particular bags that were
8    seized and calculated.
9        There was never discussion of whether there would
10   be testimony or evidence that there were additional bags
11   or additional sleeves that were carried, only as to the
12   average bag weight.
13       In fact, I can tell the Court, when I finally
14   received the Jencks material last week, I contacted
15   Mr. Drescher and said, "I don't understand why you are
16   putting him on.  He says the bag weight is exactly what
17   probation said the bag weight was."  And that was the
18   objection of which I had been put on notice and
19   probation had been put on notice.
20            THE COURT:  Okay.  So I am looking at the
21   presentence report.  I didn't know that this was going
22   to come up.  I did know it once I read your sentencing
23   memorandum.  We have a process for you to raise an
24   objection, and you objected based on the bag weight, and
25   now it's on amount of supply.

1            MR. DRESCHER:   The objection is to quantity,

2    and as the PSR notes, the objection was made, in part,

3    based on bag weight.   I made it clear throughout the

4    objection process that if we can't resolve the quantity

5    issue, I would be calling Mr. Williams' source of

6    supply.

7            The issue is obviously quantity.   Mr. Williams

8    knows who his source of supply is.   There's no dispute

9    as to who his source of supply is.   There's a question

10   as to how much he -- Mr. Biggs has supplied

11   Mr. Williams.   Mr. Biggs, being the source of supply, is

12   going to be, you know, the witness best situated to

13   testify about this.

14           The fact that part of our ob- -- in an effort to

15   resolve the quantity question, I argued bag weight.   I

16   was unable to persuade the author of the PSR that the

17   bag weight should be calculated at an amount as high as

18   I thought it should be.

19           So the PSR was very conservative in the estimation

20   of quantity, but I made clear that if we couldn't

21   resolve the issue of quantity, I intended to call the

22   source of supply.   And I wasn't trying to be tricky.   I

23   figured everybody would understand that if the question

24   was quantity, the source of supply would testify as to

25   how much quantity of drugs he had supplied the

1    defendant.

2              THE COURT:  All right.  I don't think this was

3    appropriately raised as an objection to the presentence

4    report in that when the presentence report said it was

5    to the weight of the bags, in part, impetus was on the

6    government to clarify, "No, I actually am going to

7    object" -- sit down for now -- "object to the total

8    source of drugs and the total amount of drugs."

9         On the other hand, it's raised clearly in the

10   government's sentencing memorandum.  The defendant has

11   had that.  We have had numerous extensions of

12   sentencing.  There is no surprise and no prejudice.

13   There was ample opportunity to prepare for this, and if

14   you wanted a continuance, you could have let me know

15   ahead of time.  So I am going to allow the testimony on

16   that point.

17        The government may call its first witness.

18              MR. DRESCHER:  We call Mr. Biggs.  I am not

19   sure if the marshals have him in the door or --

20              (Brief pause.)

21                        EDWIN BIGGS,

22        having been duly sworn by the courtroom deputy,

23          was examined and testified as follows:

24                      DIRECT EXAMINATION

25   BY MR. DRESCHER:

1    Q    Good afternoon.  How old are you, sir?

2    A    40.

3    Q    Can you either lean into the microphone or speak up

4    a little bit.

5         How old are you, sir?

6    A    40.

7    Q    And are you currently incarcerated?

8    A    Yes.

9    Q    And have you pleaded guilty in this court to a

10   heroin-related offense?

11   A    Yes.

12   Q    What have you pleaded guilty to?

13   A    Conspiracy to distribute kilo of heroin.

14   Q    And as part of your plea, did you also enter into

15   an agreement with the government?

16   A    Yes.

17   Q    And pursuant to that agreement, have you agreed to

18   cooperate with law enforcement?

19   A    Yes.

20   Q    Describe for the Court, please, what you understand

21   your obligations to be with regard to your agreement to

22   cooperate.

23   A    Tell the truth.

24   Q    Since you entered your plea of guilty in this

25   court, have you experienced any ramifications, any

```
 1    implications as a result of your decision to cooperate?
 2    A    Be more specific by that.
 3    Q    Has anybody threatened you or done anything
 4    untowards to you or your family with regard to your
 5    decision to cooperate?
 6    A    Yes.  I got into an altercation when I was in Ray
 7    Brook correctional facility.
 8    Q    Has your family suffered at all as a result of your
 9    decision to cooperate?
10    A    Yes.
11              MS. SHELKROT:  Objection to relevance.
12              THE COURT:  Yes.  What is the relevance here?
13              MS. SHELKROT:  Unless there's a foundation
14    here.
15              MR. DRESCHER:  I think the costs of
16    cooperation are a relevant consideration in assessing
17    the witness's decision to cooperate, his commitment to
18    go forward, his --
19              THE COURT:  So I will do that at his
20    sentencing, although he may be in front of Judge
21    Sessions.
22              MR. DRESCHER:  He is in front of Judge
23    Sessions.
24              THE COURT:  All right.
25              MR. DRESCHER:  I intend for this line of
```

```
 1    inquiry to help the Court in assessing the witness's
 2    credibility.
 3              THE COURT:   Okay.   I will allow it.   Go ahead.
 4    BY MR. DRESCHER:
 5    Q    Has your family received any threats as a result of
 6    your cooperation?
 7    A    Yes.
 8    Q    Where are you from?
 9    A    Brooklyn.
10    Q    Is that where your family lives?
11    A    Yeah.
12    Q    What do you understand the maximum sentence could
13    be to the crime you have pleaded guilty to?
14    A    Life.
15    Q    And why have you decided to cooperate?
16    A    Lesser time.
17    Q    I'm sorry.   Say that again.
18    A    Part of my plea agreement, lesser time.
19    Q    You are trying to reduce your sentence?
20    A    Yes.
21    Q    What is your -- do you have any felony
22    convictions in your criminal history?
23    A    I got two prior felonies convictions.
24    Q    Tell the Court what they are, please.
25    A    One was for robbery in '98, and one was, I blew --
```

1    I went to trial on drug case and lost in '98.

2    Q    The date of the robbery conviction was what?

3    A    It was in '90.

4    Q    '90?  And how much time did you serve on your 1998

5    drug conviction?

6    A    Almost 10 years.

7    Q    When did you get out?

8    A    October '07.

9    Q    After you got out of prison in October of '07, how

10   long did it take before you began to sell heroin?

11   A    Two, three months.

12   Q    And since that time, how have you supported

13   yourself?

14   A    Selling heroin.

15   Q    Where did your heroin sales take place, generally?

16   What town or city?

17   A    Brooklyn.

18   Q    How many customers would you estimate you supplied

19   with heroin, approximately?

20   A    That's a lot.

21   Q    Let me ask you a different question.  Is it correct

22   that there came a time when you came to understand that

23   the heroin you were distributing was making its way to

24   Vermont?

25   A    Yes.

1    Q    And what is your estimate as to how many persons

2    you distributed heroin to who were bringing the drug to

3    Vermont?

4    A    About 30 something.

5    Q    And did you have customers that were not bringing

6    the drug to Vermont?

7    A    Yes.

8    Q    So based upon your experience as a heroin dealer

9    with regard to the heroin that you supplied, what was

10   the approximate average weight per bag of heroin?

11   A    The approximate -- you mean by one bag or you

12   talking about numerous bags?

13   Q    How much would a sleeve weigh?  How much heroin

14   would be in a sleeve?

15   A    In a sleeve, I know like most -- I know like --

16   because I was -- like most time I don't sell just one.

17   I sold like -- and about 30 sleeves is about 90 grams.

18   Anywhere from 90 to a hundred grams.

19   Q    And how many bags are in a sleeve?

20   A    A hundred bags.

21   Q    So just to make sure I understood you correctly, 30

22   sleeves would be 90 to a hundred grams?

23   A    Yes.

24   Q    And that's on average?

25   A    Yes.

1    Q    Sometimes less, sometimes more?

2    A    (Witness nods head.)

3    Q    You gotta speak up.

4    A    Yes.

5    Q    Was one of your customers known to you by the name

6    Lay?

7    A    Yeah.

8    Q    Do you see Lay in court today?

9    A    Yes.

10   Q    Could you point him out, please?

11   A    Over there.

12   Q    Could you identify him by what he looks like?

13   A    Short, over there, wheelchair.

14           MR. DRESCHER:  Could the record reflect,

15   your Honor, identification of the defendant?

16           THE COURT:  The record so reflects.

17   BY MR. DRESCHER:

18   Q    How do you know Lay?

19   A    We're from the same neighborhood.

20   Q    When do you remember first meeting Lay?

21   A    Back in '97.

22   Q    When you got out of prison?

23   A    Yes.

24   Q    Do you remember where you were living at that time?

25   A    On Hancock and Malcolm X.

1    Q    Do you remember where he was living at that time?

2    A    On Gates.

3    Q    Back in '97 -- let me take a step back.

4         And other than just living in the same

5    neighborhood, did you know him in any other way?

6    A    I met him through him and a guy that I used to do

7    business with.  They went to school together.

8    Q    Was Lay a heroin customer of yours?

9    A    When?  '97, or you talking about now?

10             MS. SHELKROT:  I didn't hear that.

11   BY MR. DRESCHER:

12   Q    I'm sorry.  What did you say, sir?

13   A    You talking about '97 or you talking about now?

14   Q    When did he -- in 1997, was he a heroin customer of

15   yours?

16   A    No.  None of us was.

17   Q    Did he eventually become a customer of yours?

18   A    Yes.

19   Q    Approximately when did that start?

20   A    In 2011.

21   Q    Once Lay became a heroin customer of yours, how

22   often did you supply him with heroin?

23   A    Like every two, three days.

24   Q    And at the outset, how much heroin did you supply

25   him with?

1   A      You talking about at the beginning?

2   Q      At the beginning, yes.

3   A      One to two sleeves.

4   Q      One to two sleeves every two or three days; is that

5   right?

6   A      Yes.

7   Q      And then did the quantity change over time?

8   A      Of course.

9   Q      How did it change?

10  A      10, 15, 7, 8, 20.  Depends.

11  Q      When you say 10, 15, 7, 8, 20, what are you

12  referring to?

13  A      Sleeves.

14  Q      Did there come a time when you stopped supplying

15  him with heroin?

16  A      Yes.

17  Q      When was that?

18  A      When he got locked up.

19  Q      Do you know where he was locked up?

20  A      He said he got pulled over and locked up in

21  Vermont.

22  Q      And on that occasion, when he -- when you had

23  learned that he had been pulled over and got locked up

24  in Vermont, had you supplied him with heroin in the days

25  preceding that?

1    A    Before or after he -- before he got locked up, yes.

2    Q    And do you remember how much you supplied him

3    before he got locked up?

4    A    Yes.

5    Q    How much?

6    A    Eight and eight.

7    Q    Eight and eight, meaning what?

8    A    Eight sleeves and eight sleeves.

9    Q    So for a total of 16?

10   A    Yes.

11   Q    And before that last transaction of 16, for the

12   year before that, on average, how much heroin did you

13   supply Lay?

14   A    Depends what he wanted.  You know, like sometimes

15   he might come get 15, he might get seven, he might get

16   eight.

17   Q    And this would be like every two to three days?

18   A    Yes.

19   Q    What is your estimate as to a weekly average?  How

20   many sleeves of heroin did you supply Lay for the year

21   before you stopped dealing with him?

22   A    Depends how business was going.

23   Q    What was a typical week like for you in terms of

24   dealing with Lay?

25   A    About 15.

1    Q    15?

2    A    (Witness nods head.)

3    Q    15 sleeves?

4    A    Yes.

5    Q    A week?

6    A    Yes.

7    Q    So you said earlier that he would come every two to

8    three days.  Would that be then about five sleeves a

9    day, or would it be 15 sleeves every two to three days?

10   A    Sometimes like he might get seven, eight, nine.

11   Q    What was a typical order?

12   A    About 10.

13            MS. SHELKROT:  Objection, your Honor.  It

14   seems like this has been asked and answered.

15            THE COURT:  It has been asked and answered,

16   and what is the Court going to do with "a typical order"

17   in terms of calculating drug quantity?

18            MR. DRESCHER:  I don't think the witness has

19   been clear as to whether he is talking about a weekly or

20   per-purchase quantity.  And I am trying to get at -- I

21   am trying to clarify the record in that regard.

22            THE COURT:  All right.  But if he is dealing

23   with what's typical and he repeatedly is testifying that

24   it depends on business, and sometimes it was seven,

25   eight, or nine, how is ascertaining what he means by

```
 1    "typical," which he has already answered, going to drive

 2    drug quantity?

 3              MR. DRESCHER:  I will try and rephrase the

 4    questions, your Honor.

 5    BY MR. DRESCHER:

 6    Q    So  for that year before you stopped dealing with

 7    Lay, what would a small purchase be?

 8    A    About five.

 9    Q    What would a large purchase be?

10    A    About 15, 20.

11    Q    And that's per occasion of him getting drugs from

12    you?  That's per -- every two or three days?

13    A    Yes.

14    Q    How quickly after you started supplying him with

15    heroin in 2011 did he get up to these levels of

16    quantity?

17    A    Probably about a month or two.

18    Q    What sort of pricing did you charge him?

19    A    500.

20    Q    500 per sleeve?

21    A    Yeah.

22    Q    $5 per bag?

23    A    Yeah.

24              MR. DRESCHER:  Your Honor, if I could just

25    have a moment?
```

```
 1                    THE COURT:  You may.

 2                    (Brief pause.)

 3   BY MR. DRESCHER:

 4   Q    Did you have any conversations with Lay in which

 5   the topic was guns?

 6   A    Yes.

 7   Q    Tell the Court about that, please.

 8                    THE COURT:  So how is this not outside the

 9   scope of what you disclosed in the presentence report?

10                    MR. DRESCHER:  Well, it's -- there's a dispute

11   as to the gun enhancement.  He is here.  It's part of --

12   what I believe he is about to say was produced to Miss

13   Shelkrot as part of Jencks.  If your Honor does not want

14   me to inquire as to --

15                    THE COURT:  Well, that's a fair argument.  She

16   is challenging the gun enhancement, and she's put it at

17   issue, and you have your witness here, and we could have

18   you call your witness after she puts on her witness, but

19   I will allow it.

20   BY MR. DRESCHER:

21   Q    Please tell the Court about conversation -- a

22   conversation or conversations you've had with Lay in

23   which the topic was guns.

24   A    You know, one -- one thing I didn't do, I didn't

25   buy -- I never bought no guns off him or nobody coming
```

1   from there.  I didn't want the extra the problems.  It
2   was offered but I never bought none.
3   Q    It was offered?
4   A    It was offered but I never bought none.
5   Q    Did you -- did Lay give you any indication as to
6   where he was getting what he was offering?
7              MS. SHELKROT:  Objection.  Objection.
8              THE COURT:  Sustained.
9   BY MR. DRESCHER:
10  Q    What was he offering?
11             THE COURT:  So we haven't even established
12  that --
13  A    Guns.
14             THE COURT:  -- he was offering it.  So he
15  said, "I -- it was offered but I never bought them."  He
16  hasn't identified who offered anything.
17  BY MR. DRESCHER:
18  Q    What was offered?
19  A    Guns.
20  Q    Who offered it?
21  A    Lay.
22  Q    And just to be clear, you declined the offer?
23  A    I never bought none.
24  Q    Meaning you never bought guns from Lay?
25  A    No.

1          MR. DRESCHER:  Nothing further.

2          THE COURT:  All right.  Any cross examination?

3          MS. SHELKROT:  Yes, your Honor.

4                    CROSS EXAMINATION

5    BY MS. SHELKROT:

6    Q    Good afternoon, Mr. Biggs.

7    A    How you doing?

8    Q    My name is Lisa Shelkrot.  You have a street name,

9    Mr. Biggs?

10   A    Yes, I do.

11   Q    What is that name?

12   A    Money Boss.

13   Q    Money Boss.  Sometimes just "Boss"?

14   A    Yeah.

15   Q    Why did you have that street name?

16   A    It's a name I picked up when I was a kid.

17   Q    Would it be fair to say that you were the boss of

18   people that were coming up to Vermont with heroin?

19   A    What you mean by -- what you mean by their "boss?"

20   Q    What do I mean by their "boss"?

21   A    Yeah.

22   Q    Is it fair to say you were the person who was

23   supplying a very large number of people with heroin to

24   bring to Vermont?

25   A    Yes.

1    Q    They worked for you, right?

2    A    They didn't work for me.  They were buying work off

3    of me.

4    Q    And what did they give you for that?

5    A    Money.

6    Q    And you kept that money?

7    A    Yes.

8    Q    You made your money off their work?

9    A    Yes.

10   Q    So you testified earlier that you had two prior

11   criminal convictions; am I right about that?

12   A    Yes.

13   Q    You actually had three, didn't you?

14   A    Yeah.  I meant I got two prior felonies; two bids I

15   did.

16   Q    You have one second-degree robbery from 1990,

17   right?

18   A    Yes.

19   Q    You also had an attempted second-degree robbery,

20   correct?

21   A    That's all one case.

22   Q    They were sentenced at the same time, but two

23   different cases, right?

24   A    I had one -- I had one felony for robbery, and I

25   did a three-and-a-half-to-seven, but I was on probation,

1    and they put the case together.

2    Q    Would it refresh your recollection if I remind you

3    that you had a sentence of one-to-three for a

4    second-degree robbery, and then a second sentence of

5    three and a half to seven for an attempted robbery?

6    A    Yes.

7    Q    So that's two different convictions there, right?

8    A    It supposed to be -- my recollection of sentencing,

9    they supposed to be a one -- it was a one to three for

10   one case and a two-and-a-half-to-five.  Instead they

11   gave me a three-and-a-half-to-seven.

12   Q    Have you seen a copy of your rap sheet before?

13   A    I ain't seen it in a long time.

14   Q    You seen it before, though?

15   A    I would assume so, yes.

16   Q    And by the way, what was the name you gave the

17   police when you were arrested on that first robbery?

18   A    Um, my -- it should be Lance Marshall.

19   Q    Actually Lance Marshall was the second robbery.

20   First robbery was Ray Jones.  Remember that?

21   A    Yes.

22   Q    That's not your name, is it?

23   A    No, it's not my name.

24   Q    So that that was a lie, correct?

25   A    Yes.

1   Q     When you were arrested on the second robbery, that

2   was when you gave them the name Lance Marshall, right?

3   A     Yes.

4   Q     Also not your name?

5   A     No.  Lance is not my name.  But Marshall's my

6   original name I was born with; Edwin Marshall.

7   Q     Did you give 'em the name Lance Marshall so that

8   they could help find out who you really were?

9   A     You say what?

10  Q     When you were arrested and you gave the name Lance

11  Marshall, did you intend to make it possible for the

12  police to figure out who you really were?

13  A     No.

14  Q     You intended to try and escape from that, didn't

15  you?

16  A     Yes.

17  Q     And then your third conviction was your drug

18  conviction, right?

19  A     Yes.

20  Q     And that was for selling crack?

21  A     Yes.

22  Q     So you went to jail and -- I should say you

23  actually continued to sell crack all the way up through

24  your trial, didn't you?

25  A     No.

1    Q     No, you didn't do that?

2    A     No, I did not.

3    Q     Did you tell the agents that you continued to sell

4    crack all the way up through your trial?

5    A     I didn't -- I never was rearrested for no crack or

6    nothing.  No, I was not.

7    Q     You went to trial on your crack case, correct?

8    A     Yes, I did.

9    Q     And I am not asking you whether you were

10   rearrested.  I am just asking whether you continued to

11   sell crack throughout the time that you were waiting for

12   trial on your crack case?

13   A     What you mean by "continue"?

14   Q     I'm just asking, did you sell crack during the time

15   that you were waiting to go on trial?

16   A     No, I did not, ma'am.

17   Q     Do you remember telling the agents that you did?

18   A     No.

19   Q     So when you came out of jail for the robbery, that

20   was 1997?

21   A     Yes.

22   Q     And you started selling crack right away, right?

23   A     I would assume, yes.

24   Q     And by the time you came out, it was roughly 2007,

25   you said?  October 2007?

1    A    I went to jail in '98, and I came home in October
2    '07.
3    Q    And when you first came home, you tried selling
4    crack again, didn't you?
5    A    Yes.
6    Q    But it turns out that by that point, heroin had
7    become more profitable, correct?
8    A    Yes.
9    Q    And so you switched your attention to heroin?
10   A    Yes.
11   Q    And you began selling heroin in January 2008,
12   right?
13   A    Yes.
14   Q    And continued right up through your arrest here in
15   Vermont in September of 2013, correct?
16   A    What year you say?
17   Q    September of 2013.  A year ago.
18   A    Yes.
19   Q    Be fair to say that you professionalize in selling
20   heroin, right?
21   A    Yes.
22   Q    Those are your words, aren't they?
23   A    Yes.
24   Q    Now, you and your drug crews, you have used
25   violence to settle disputes, have you not?

1    A    I never been convicted for nothing violent.

2    Q    I didn't ask you whether you have been convicted.

3    I asked you whether you have used violence.

4    A    Me *per se*?  No --

5    Q    Yes.

6    A    No, I did not.

7    Q    You personally never used violence?

8    A    Never.

9    Q    You didn't shoot somebody over a drug dispute in

10   1998?

11   A    I shot somebody in '98 over a drug dispute?

12   Q    You tell me.

13   A    No, I did not.

14   Q    Did you go out with a crew another time in 1998 and

15   chase somebody down until your gun jammed?

16   A    You said in '98, I chase somebody down with a crew?

17   Q    That's what I am asking you.

18   A    No.

19   Q    Did you try to kill a guy in 1998 but ran out of

20   bullets?

21   A    Um, you mean shoot at somebody or tried to shoot at

22   somebody and never was?  Yes.

23   Q    So when I asked you a minute ago if you had used

24   violence to try and settle disputes, you said no, were

25   you not thinking about trying to shoot someone?

1    A    No, you said with a crew.  And '98, I didn't have
2    no crew or nothing like that.
3    Q    So it was just you personally?
4    A    Me and somebody else.
5    Q    You and somebody else shooting at somebody to
6    settle a drug dispute?
7    A    And it wasn't no drug dispute.
8    Q    It was a different kind of a dispute.
9    A    Yes.
10   Q    What was that dispute about?
11   A    Somebody was going to -- he said he was going to
12   rob me and all that.
13   Q    And so you tried to shoot him?
14   A    Trying to shoot somebody is busting a gun.
15   Q    Excuse me?
16   A    Trying to shoot somebody is like busting a gun,
17   ain't it?  Shots being fired or something like that?
18   I'm asking.
19   Q    About whether trying to shoot somebody is --
20   A    No.  I am saying, you saying trying to shoot
21   somebody; what do you mean by that?  Be more specific.
22   Q    Do you have an understanding of what it means to
23   try to shoot someone?  You get a gun.  It's loaded.  And
24   you fire it.  Is that trying to shoot somebody, as far
25   as you are concerned?

1   A     Yes, that would be trying to shoot somebody.  Yes.

2   Q     And you did that to this guy that you were in a

3   dispute with?

4   A     Yes.

5   Q     When you were arrested in 2013, last year, you were

6   involved in some kind of a dispute with a different crew

7   over some robbery that they had been involved in, right?

8   A     Yes.

9   Q     That's Sheeny's crew?

10  A     Yes.

11  Q     And you directed that there be shootings of those

12  people, didn't you?

13  A     I never did nothing.  Nothing was ever done to

14  nobody.

15  Q     Did you direct that somebody else retaliate against

16  the people who had robbed you?

17  A     That was -- you know, like, people was talking but

18  nothing never was done.

19  Q     Okay.  I am not asking whether you were successful

20  in it.  I am asking whether you actually directed that

21  violence against somebody else.

22  A     Just words.

23  Q     Just words.  You just told 'em to do it; you don't

24  know if they did it or not?

25  A     Nobody never did nothing.

1    Q    You did tell them though, right?  You did try to
2    arrange for that violence?
3    A    It was just talk.  Nothing never was done.
4    Q    Did you beat somebody who badmouthed you?
5    A    What you mean by that?
6    Q    What do I mean by "beat" or what do I mean by
7    "badmouthed"?
8    A    You said did I beat somebody that badmouthed me?
9    Q    Yeah.
10   A    I hit somebody before.
11   Q    I'm sorry?
12   A    I hit somebody before.
13   Q    Did you tell the agents in this case that you once
14   beat someone up because he had been running his mouth
15   about you?
16   A    Punched somebody one time.
17   Q    Knocked him out?
18   A    Yes.
19   Q    Did you tell the agents that you had directed
20   shootings of this crew that you were in a dispute with
21   back in 2013?
22   A    You said -- never was no shooting.
23   Q    I understand that.  Did you tell the agents that
24   you directed that there be shootings?
25   A    What you -- you mean like -- that I sent somebody

1    over to shoot somebody?

2    Q    Yeah.

3    A    No, nobody ever shot nobody over there, not coming

4    from me.

5    Q    Have you threatened cooperators in the past?

6    A    What you mean by that?  Threatened who?

7    Q    You know what a cooperator is, right?  Somebody who

8    does what you're doing.

9    A    Yes.

10   Q    And have you threatened them in the past?

11   A    The only -- only -- only situation I have had

12   before when I hit somebody in the mouth, and that was

13   it.

14   Q    Did you have an Instagram account, Mr. Biggs?

15   A    I had two Instagram accounts before.

16   Q    Two Instagram accounts?  Did you ever use your

17   Instagram accounts to talk about rats and -- and what

18   rats would have done to them?

19   A    Yes.

20   Q    You know what -- what did you mean by a rat?

21   A    It's a picture on Instagram I put -- my son had a

22   doll or something, Chuck E. Cheese doll.

23   Q    It was a big rat?

24   A    The picture's a little doll, like this

25   (indicating).

1    MS. SHELKROT:  The Court will indulge me for a

2    minute?

3    THE COURT:  So we can see it, and you

4    should -- we'll identify this as Defendant's Exhibit --

5    MS. SHELKROT:  I didn't put stickers on

6    anything, but I wasn't intending to introduce it

7    necessarily.

8    THE COURT:  Well, it's on the screen, so it is

9    being introduced.

10   MS. SHELKROT:  Fair enough.  I will hand label

11   it for the moment --

12   THE COURT:  That's fine.

13   MS. SHELKROT:  -- so we can keep track of it

14   then.

15   THE COURT:  Okay.  And it's Defendant's

16   Exhibit A?

17   MS. SHELKROT:  Defendant's Exhibit A.

18   THE COURT:  Okay.

19   BY MS. SHELKROT:

20   Q    Is that a picture from your Instagram account, Mr.

21   Biggs?  There's actually a screen right behind you, if

22   that helps you.

23        That's from your Instagram account, right?

24   A    Yes.  It look like the Chuck E. Cheese doll.

25   Q    And the date on that -- if you look right

```
 1    underneath the picture -- it's 9/7/2013; do you see
 2    that?
 3                MR. DRESCHER:  Excuse me, I -- from what's on
 4    the screen, we can't see what she's referring to.
 5                MS. SHELKROT:  Oh, sorry.
 6                THE WITNESS:  You can't see the --
 7                MS. SHELKROT:  Sure enough.
 8    BY MS. SHELKROT:
 9    Q    Do you see that two lines under the picture,
10    there's a -- it says "taken 23-9-7"?
11    A    Yes.
12    Q    So that's just a few days before your arrest here
13    in Vermont, correct?
14    A    Yes.
15    Q    And then you see the very bottom line here it says
16    "caption," right?  You see that, where it says
17    "caption"?
18    A    Yes.
19    Q    And then you actually have to turn to the next page
20    as it printed out to see your caption here.  You see
21    three lines down there's text with your caption?
22    A    Yes.
23    Q    This is your Money Boss account, right?  At -- on
24    Instagram?
25    A    Yes.
```

1    Q    You wrote, "Niggas like this, I don't like
2    disloyal -- disloyal.  Fake.  Do anything to get out of
3    jail.  Willing to lie to cut a deal."  You wrote that,
4    right?
5    A    Yes, I did write that.
6    Q    That very last few words here, do you see where I
7    am pointing, "DMT don't do rats"?  You see that?
8    A    Yes.
9    Q    What does DMT stand for?
10   A    That was the murder team.
11   Q    The "da murder team"?  That was your team?
12   A    It was a group of people I was hanging with.
13   Q    That you called yourselves "da murder team"?
14   A    (Witness nods head.)
15          THE COURT:  So we did get an answer to that?
16          THE WITNESS:  I told -- yes.
17          THE COURT:  Okay.
18   BY MS. SHELKROT:
19   Q    So you have pled guilty to dealing -- or to a
20   conspiracy to distribute in excess of one kilo of
21   heroin, correct?
22   A    Yes.
23   Q    Now, you testified before -- Mr. Drescher asked you
24   how much a sleeve weighed, and you couldn't really say
25   how much one sleeve weighed, but you said 30 sleeves is

```
1    90 to a hundred grams, right?

2    A    Yes.

3    Q    So you can just do the math and say 300 sleeves is

4    900 to a thousand grams, right?

5    A    Yes.

6    Q    So 300 or maybe a little bit more sleeves is a

7    kilo; fair to say?

8    A    Somewhere around there, yes.

9    Q    Somewhere around there.  So back in 2008, when you

10   first started selling heroin, you started getting two

11   sleeves at a time, right?

12   A    Yes.

13   Q    And you said you pretty quickly moved up to getting

14   10 sleeves at a time, right?

15   A    Yes.

16   Q    And you sold those 10 sleeves in about a week?

17   A    Yes.

18   Q    So that's right -- you were selling 500 sleeves, a

19   little more than 500 sleeves a year back in 2008, right?

20   A    Yes.

21   Q    So you're selling over a kilo a year way back in

22   2008, right?

23   A    Yes.

24   Q    And you have only been dealing bigger and bigger

25   quantities since then, right?
```

```
1    A    Yes.

2    Q    So fair to say that pleading guilty to distributing

3    a kilo doesn't even begin to touch what you've

4    distributed?

5    A    Yes.

6    Q    That a kilo is a pretty insignificant quantity, as

7    far as you have been concerned?

8    A    As far as I was concerned?

9    Q    As far as you are concerned.  As far as your own

10   activity is concerned, a kilo is not terribly

11   significant, is it?

12   A    I say it is.

13   Q    You'd say it is?  How long did it take you to sell

14   a kilo in 2013?  How long did it take you to sell 300

15   bags in 2013?  Oh, sorry.  300 sleeves.

16   A    How much it take 300 sleeves?

17   Q    Yeah.

18   A    Could take about -- some -- like two weeks.

19   Q    So as of 2013, you were selling about a kilo every

20   two weeks, right?

21   A    Yes.

22   Q    In fact, you told Detective Merchand, when you were

23   arrested, that if you were released, you could go out

24   and get 150 sleeves just in one shot, right?

25   A    Yes, I could.
```

1    Q    That would have been easy for you to do?

2    A    Yes, it would've.

3    Q    And ever since 2009, you have been getting at least

4    a 50-50 split on everything you sold.

5    A    Yes.

6    Q    And by the way, you apparently were also continuing

7    to sell crack in some quantity through this time,

8    correct?

9    A    What do you mean by -- what do you mean by that?

10   Q    What do I mean by crack?

11   A    No.  You said selling with it?  What you mean by

12   that?  You want specific.

13   Q    Well, you don't use crack, do you?

14   A    No, I don't.

15   Q    Have you ever used crack?

16   A    No.

17   Q    Okay.  When you were arrested in Vermont, you

18   were -- you had 17 grams of crack with you.  Correct?

19   A    That was -- that's -- yes.  In my case is 17 grams

20   of crack, yes.

21   Q    And you were continuing to buy crack in the years

22   before your 2013 arrest, right?

23   A    What you saying?

24   Q    I asked if you were continuing to buy crack during

25   the years before your 2013 arrest.

1   A    Yes, I was -- yeah.

2   Q    And that wasn't for your own use -- right? --

3   because you don't use crack.

4   A    No.

5   Q    It was for sale.

6   A    Yes.

7   Q    So you were continuing to sell crack during the

8   years before your 2013 arrest.

9   A    Yes.

10  Q    But that was just a sideline, right?  Not your

11  primary -- not your primary product.

12  A    No.

13  Q    And I should point out that you weren't even

14  charged with the 17 grams of crack that you were

15  arrested with here in Vermont, were you?

16  A    No, I was not.

17  Q    Has anybody even talked to you about those 17 grams

18  of crack?

19  A    When I -- it said in my paperwork, it's in there.

20  Q    I beg your pardon?

21  A    In my paperwork.

22  Q    In your paperwork, in the affidavit, in the

23  complaint affidavit, they mention it, right?

24  A    Yes.

25  Q    But no one's ever talked about charging you with

1   that?

2   A    No, I'm not too sure about that.

3   Q    Are you expecting to be charged with conspiring to

4   distribute the 17 grams of crack or any other crack?

5   A    I don't know.

6   Q    So fair to say that in the summer of 2013, in the

7   months before you were arrested, you were pretty much on

8   top of the world, right?

9   A    I was doing all right for myself.

10  Q    You had stacks and stacks of cash, right?

11  A    Yes.

12  Q    You had fancy jewelry?

13  A    Yes.

14  Q    You had fancy cars?

15  A    Yes.

16  Q    You had the Bentley, right?

17  A    I never had a Bentley before.

18  Q    You never had a Bentley?

19  A    No, I have not.

20  Q    Did you tell the agents you had a Bentley?

21  A    Somebody in my family had a Bentley and I was

22  riding around in it.  It was my nephew's car.  I never

23  had a Bentley.

24  Q    Did you buy it?

25  A    No, I did not buy it.

1   Q    Did you give your nephew the money for it?

2   A    I never gave nobody no money for no Bentley.

3   Q    Okay.  So you didn't tell the agents that you

4   bought a Bentley?

5   A    I never bought a Bentley.  I was riding around in

6   my nephew's car.  I let him hold my S550 that I had, and

7   he let me hold his Bentley.

8   Q    My question is whether you told the agents that you

9   had it.

10   A    I was driving around in it, yes.

11   Q    You bought yourself an Infiniti?

12   A    Yes.

13   Q    You bought yourself a Cadillac SUV?

14   A    I had a Cadillac before, yes.

15   Q    You bought yourself an Audi?

16   A    I had an Audi truck before, yes.

17   Q    There was a BMW that you bought also?

18   A    I never had a BMW before.

19   Q    Am I missing any of the fancy cars?  Am I

20   forgetting any of them?

21   A    What you mean by -- like, um, I had S550 before.  I

22   had a few Escalades before, yes.

23   Q    And all that lifestyle was funded through heroin

24   sales.

25   A    Yes.

1   Q     Now, you stopped dealing with my client,

2   Christopher Williams, when he was first arrested in

3   February 2013, right?

4   A     Yes.

5   Q     Because you were worried that maybe he was

6   cooperating?

7   A     Um, yes.

8   Q     So I take it, then, that you stopping dealing with

9   him didn't put a dent in your lifestyle?

10   A     Yes.

11   Q     Yes, I'm right.  Didn't put a dent in your

12   lifestyle, right?

13   A     You know, it hurt a little, but I couldn't risk it.

14   Q     You were -- you had the stacks of cash all through

15   the summer of 2013, right?  Stacks of cash, the cars,

16   the girls, the champagne; that continued all through

17   summer of 2013, didn't it?

18   A     Somewhat, yes.

19   Q     "Somewhat," did you say?

20   A     Yes.

21   Q     If I'd go back through your Instagram accounts and

22   show you the pictures, it's going to be picture after

23   picture of you with stacks of cash and the champagne and

24   the girls and the cars and all that all through the

25   summer of 2013, right?

1   A   Somewhat, yes.

2   Q   Just as much as ever; isn't that true?

3   A   Not much as ever, as before, no.

4   Q   You testified in the grand jury, didn't you?

5   A   Yes.

6   Q   And you named your biggest customer, correct?

7   A   Yes, I did.

8   Q   Not Mr. Williams, was it?

9   A   No.

10  Q   We're talking about your biggest customer in

11  Vermont, right, when you spoke to the grand jury?

12  A   Yes.

13  Q   Because you had customers also going to Long

14  Island, right?

15  A   Yes.

16  Q   You also had customers distributing in

17  Pennsylvania?

18  A   Yes.

19  Q   You have customers distributing in Connecticut?

20  A   Yes.

21  Q   But when you testified in the grand jury, you were

22  just talking about your biggest customer in Vermont,

23  right?

24  A   Yes.

25  Q   Okay.  Now, it's a little tricky for me because my

1    copy of it is redacted.  I have got a bunch of blanks

2    where you actually gave names, so I am not asking you

3    the names because I don't need to know them, but I do

4    need to count them up, okay?

5         So you tell them your biggest customer, and then

6    you named two pretty big customers, right?  Do you

7    remember that?  Do you remember your grand jury

8    testimony?

9    A    Yes.  I said yes.

10   Q    Okay.  And those other two pretty big customers of

11   yours were also not Mr. Williams, right?

12   A    No.

13   Q    And then you named, looks like, at least two other

14   people that would be also in the big group; not

15   Mr. Williams.

16   A    Yes.

17   Q    So you had at least, it looks like, five customers

18   in Vermont bigger than Mr. Williams.  Correct?

19   A    Somewhere around there, yes.

20   Q    You actually were never asked about Mr. Williams in

21   the grand jury, were you?

22   A    No.

23   Q    Because he really just wasn't one of the big fish

24   as far as you were concerned.

25            MR. DRESCHER:  Objection.  There's no

1    foundation that the witness would know that.

2              THE COURT:  I'll allow it.

3    BY MS. SHELKROT:

4    Q    He wasn't one of the big customers as far as you

5    were concerned?

6    A    The question was, I remember correctly, ask me who

7    my biggest customers, and I told them who it was.

8    Q    And Mr. Williams' name never came up?

9    A    He wasn't one or two; no, he was not.

10   Q    He wasn't one, two, three, four or five, was he?

11   A    He wasn't one or two, no.

12   Q    Or three or four or five.

13   A    No.

14   Q    Now, fair to say that by 2011, you were not

15   fronting any heroin to anybody, were you?

16   A    In 2011?

17   Q    Yeah.

18   A    Did I ever front anything to somebody?

19   Q    Yeah.

20   A    Yes, I did.

21   Q    Were you fronting any heroin to Mr. Williams?

22   A    When -- you know, like he come, I give him some.

23   He pay for some and then I front him some.

24   Q    How much of the heroin that you were supplying for

25   the Vermont market were you fronting?

1    A    Depends on the individual.

2    Q    How much of the heroin that you supplied to Mr.

3    Williams were you fronting?

4    A    If -- if he -- depends what he come to get.

5    Q    I beg your pardon?

6    A    Depends what he was coming to purchase.

7    Q    Depends what he was coming to purchase?

8    A    Yes.

9    Q    Well -- so you testified earlier that people just

10   bought from you.

11   A    Yeah, that's in some cases.  Not every -- not --

12   like some people come and buy straight.  That like --

13   it's just like any kind of business.  You know the

14   people that you dealing with.  Some people that you can

15   give to and you could front and you not afraid they

16   bring the money back, and some people don't.

17   Q    So what was your take when you were fronting heroin

18   to people?

19   A    What was my take?  Sometimes like -- say like -- if

20   a dude's a friend, somebody I could trust, I'd give it

21   to 'em.  And when he come back, I'd get my money.

22   Q    I can't hear you.  I didn't hear the last part.

23   A    Say like -- say like someone -- the person I was

24   getting it from, right, they give it to me.  I am

25   responsible for it.  So, you know, like -- say like it

1   depends on the individual that's coming to get it,

2   depends if I could trust 'em or not.

3   Q    Yeah.  And so my question was, what was your take?

4   When somebody would come and you would front them

5   heroin, how much did you let them keep?  How much of the

6   profits did you let them keep?

7   A    You mean from -- this what -- like -- so like -- so

8   like if he was coming from me and getting it, and you

9   came -- say like you -- say like you wanted 15 and you

10  have money for 10, all right.  So when you finished, you

11  gotta give me my money down, the ones that I charged you

12  for.

13  Q    Yeah.  And when I came back with the money for the

14  rest of it, how much of it do I get to keep?

15  A    All you got to do is -- all you gotta -- say

16  like -- say like I charge you $500, right, for each one,

17  and I gave you 10.  So that mean you owe me for five.

18  You owe me -- you owe me $2400.  That's what I get.

19  Q    You are saying the rest of the sale price, whatever

20  they sold, they would get to keep?

21  A    That's their money.

22  Q    So going back to my question about fronting.  It's

23  your testimony now that you were still fronting people

24  heroin as late as 2011?

25  A    In 2011?  Not a lot of people, but a few people

1    here and there.  Depends on whether I could trust 'em or

2    not.

3    Q    Were you fronting people in 2012?

4    A    Yes.

5    Q    Your biggest customers?

6    A    The biggest customers -- most of the time the

7    biggest customers, you know, like -- they got their

8    money.

9    Q    Did you -- did you keep any written records of how

10   much you were supplying to people?

11   A    No.

12   Q    How did you keep track of what somebody owed you if

13   you were fronting them?

14   A    Sometimes instance I remember or sometimes I would

15   put it in my phone or something like that.

16   Q    So you said you think you were supplying about 30

17   people in Vermont; is that right?

18   A    Yes.

19   Q    And what's that number based on?  Have you just

20   gone through and sort of tried to think of everybody you

21   can remember?

22   A    No.  In my line -- in my line of business stuff I

23   was doing, I knew like -- I knew the people I was

24   dealing.  I know how many I was dealing with.

25   Q    And how many people were you supplying?  How many

```
 1    customers did you have for the Long Island market?
 2    A    Depends.  It depends what year you talking about.
 3    Q    Let's talk about 2012 and 2013, up until your
 4    arrest.  Say the last 18 months before your arrest.
 5    A    Long Island?  Probably about two or three.  Not a
 6    lot.
 7    Q    And what about Pennsylvania?
 8    A    It's about two or three.
 9    Q    And you don't have any written records of what you
10    were supplying to any of those people?
11    A    Not written down, no.
12    Q    Did the government ever ask you for any of your
13    records for any of that?
14    A    No.
15    Q    So anything that you can say about quantities is
16    just off the top of your head?
17    A    My memory, yes.
18    Q    Mr. Drescher asked you earlier about whether you
19    had suffered any consequences as a result of your
20    cooperation with the government.  I just want to be
21    clear:  You don't have any information any of that had
22    to do with my client, do you?
23    A    No.
24    Q    He didn't have anything to do with that.
25    A    No.
```

1    Q    And, in fact, you don't have any information about

2    any violence by Mr. Williams at all, do you?

3    A    What you mean?  Towards me?

4    Q    Towards anybody.  You have any information about

5    any violent behavior that he has been involved in?

6    A    No.

7    Q    And you say that he once offered you a gun, right?

8    A    Offered, yes.

9    Q    He tell you that he had one?

10   A    He tried to -- it was a business proposal, but I

11   never bought nothing off him.

12   Q    You never saw him with a gun?

13   A    No.

14   Q    And he never told you that he had one, did he?

15   A    He what?

16   Q    He never told you that he had one, did he?

17   A    Yes, he did.

18   Q    But you never saw it?

19   A    Never.

20   Q    You never saw any evidence that he had one?

21   A    No.

22   Q    You had your own guns though, right?

23   A    Yes.

24   Q    So it's not like you were turning him down because

25   you weren't interested in guns.

```
 1    A    No.  I turned him down because I was -- I didn't

 2    want -- I didn't want to deal with these people like in

 3    drugs and then involve guns because I was scared of the

 4    consequences.

 5    Q    The legal consequences?

 6    A    Yes.

 7              MS. SHELKROT:  If I could just have a moment,

 8    your Honor?

 9              THE COURT:  Yes.

10              (Brief pause.)

11              MS. SHELKROT:  That's all I have.

12              THE COURT:  All right.  Any redirect?

13              MR. DRESCHER:  No.

14              THE COURT:  All right.  Thank you, sir.  You

15    may step down.

16              (Witness excused.)

17              THE COURT:  Any further witnesses for the

18    government?

19              MR. DRESCHER:  No, your Honor.

20              THE COURT:  Any witnesses for the defendant?

21              MS. SHELKROT:  I need to think for a second

22    about whether I need to call Detective Merchand.  If I

23    can just take a couple minutes and look at my notes and

24    see what, if anything, I need from him, your Honor?

25              THE COURT:  Okay.
```

```
1              (Brief pause.)
2              MS. SHELKROT:  Yes, I do need to call
3   Detective Merchand, please.
4              THE COURT:  All right.  You may do so.
5                   DANIEL MERCHAND,
6       having been duly sworn by the courtroom deputy,
7       was examined and testified as follows:
8                   DIRECT EXAMINATION
9   BY MS. SHELKROT:
10  Q    Good afternoon.
11  A    Good afternoon.
12  Q    All right.  Detective Merchand, you were one of the
13  case agents who worked with Mr. Williams, correct?
14  A    Correct.
15  Q    And you got involved soon after he was arrested in
16  the southern Vermont, as I recall?
17  A    Yes.
18  Q    And Mr. Williams began talking to you about some of
19  the facts of the case when you were at the -- at
20  Fletcher Allen with him waiting for a -- a warrant to be
21  executed, correct?
22  A    Correct.
23  Q    At that time he didn't have counsel, correct?
24       I'm sorry.  You know what?  That's actually not
25  true.
```

1    A    He did have counsel.

2    Q    By the time you got to the hospital, he did have

3    counsel.

4    A    Correct.

5    Q    By in any event, he began talking to you and

6    indicating that he wanted to cooperate and give you

7    information?

8    A    Correct.

9    Q    And he did give you some information there at the

10   hospital?

11   A    He did.

12   Q    Once he was returned from the hospital, we then

13   have a formal proffer session, correct?

14   A    Correct.

15   Q    You were there.  I was there.  Mr. Williams was

16   there.

17   A    Yes.

18   Q    And I think it was AUSA Nolan, if I am not

19   mistaken?

20   A    Correct.  Yes.

21   Q    And Mr. Williams spoke with you for several hours

22   at that point, did he not?

23   A    He did.

24   Q    And he discussed with you his drug-related

25   activities in Vermont?

1    A    He did.

2    Q    And that -- what he told you at that point was

3    consistent with other information that you had, wasn't

4    it?

5    A    Yes.

6    Q    It corroborated other information and, in turn, was

7    corroborated by other information you had?

8    A    Yes.

9    Q    And he identified his primary source of supply as

10   Edwin Biggs?

11   A    Not by name, but yes.

12   Q    He called him Boss?

13   A    Correct.

14   Q    And at that point you guys hadn't arrested

15   Mr. Biggs yet, right?

16   A    No, we had not.

17   Q    He also told you about Boss's organization, right?

18   A    Yes.

19   Q    He gave you the names of a number of other people

20   who worked for Boss?

21   A    Yes.

22   Q    And he indicated his willingness to cooperate

23   against Boss?

24   A    Yes.

25   Q    Included in the names, the people he gave you, was

1    Jahkim Brewer?

2    A    Yes.

3    Q    That was the individual who later was arrested with

4    Boss?  Mr. Biggs.

5    A    Yes.

6    Q    And you considered his information reliable, didn't

7    you?

8    A    For the most part, yes.

9    Q    Mr. Williams allowed you to search his cell phones?

10   A    Yes.

11   Q    And he gave you his passwords for that purpose,

12   right?

13   A    Yes, he did.

14   Q    And that allowed you to do an immediate dump of all

15   of the material on the cell phone?

16   A    Correct.

17   Q    And that saved you the time of getting a warrant

18   and also sending them back to the manufacturer to have

19   them decrypt it, all of that?

20   A    Yes.

21   Q    You were then present either at or shortly after

22   his arrest in June of 2013, right?

23   A    Down in New York City?

24   Q    Yes.

25   A    Yes.

1    Q    He had been indicted at that point, right?

2    A    I thought we dismissed the complaint that had

3    originally been filed.  I don't remember -- oh, you mean

4    when he was arrested?

5    Q    When he was arrested back in June.

6    A    I thought you meant the other meeting.  Yes.

7    Q    When he we arrested back in June.

8    A    Yes.

9    Q    And he told you at that time he was no longer able

10   to deal with Boss because Boss had stopped dealing with

11   him back in February?

12   A    Yes.

13   Q    Which is consistent with what Mr. Biggs said today?

14   A    Yes.

15   Q    He also told you that he had been shot at by

16   somebody from Boss's car?

17   A    He did, yes.

18   Q    But he gave you more information about Jahkim

19   Brewer?

20   A    Yes.

21   Q    And that information, I think in combination with

22   the information that he gave to you --

23   A    Yes.

24   Q    -- in February, you actually used in connection

25   with your request for a warrant associated with

1    Mr. Brewer's case.  Does that ring a bell at all?

2    A    I'm not positive on that one.  I would have to look

3    at some reports.  There were several reports in this

4    case.

5    Q    I will help.

6    A    And I had a few meetings with Mr. Williams.

7    Q    I will help.

8         MR. DRESCHER:  If I may, your Honor:  I don't

9    want to get in the way of anything that's going to be

10   pertinent to one of the sentencing issues, but at the

11   moment I'm not -- it's not clear to me -- perhaps it's

12   clear to the Court or Miss Shelkrot -- as to where we

13   are going relative to issues at sentencing.

14        Basically it's a relevance -- if not an objection,

15   a relevance concern; call it an objection.  I want to

16   make sure we're focusing our attention on something

17   pertinent here.

18        THE COURT:  So it sounds to me like you are

19   making an argument for substantial assistance that

20   doesn't qualify for a motion, and that doesn't seem to

21   be a sentencing argument that you flagged for this

22   witness.  So where are we going with this?

23        MS. SHELKROT:  Well, I don't know whether I

24   need to flag it for the witness, your Honor, but it

25   certainly goes to history and characteristics of the

```
1    defendant under 3553(a) and acceptance of responsibility
2    and the degree to which he has attempted to make amends
3    and -- and move his life on a more productive track.  I
4    think that is all highly relevant.
5              THE COURT:  Well, it might be relevant, but it
6    wasn't an issue even raised in the sentencing
7    memorandum, that I recall; that sometimes people flag
8    the issue and say, Even though there is no 5K1.1 motion,
9    we're still thinking that some credit should be given
10   for substantial assistance.
11        But let me ask if Mr. Drescher objects to this line
12   of questioning?
13             MR. DRESCHER:  No.  The Court should have
14   whatever information is appropriate for -- under 3553(a)
15   or otherwise.  I may stand up in a moment and object,
16   but I don't want to get in the way of the sentencing
17   presentation.  I just want to express some concern, that
18   I have done, and I'll sit down.
19             MS. SHELKROT:  Your Honor, I should actually
20   be really explicit.  The very particular reason I didn't
21   put it in the sentencing memorandum is because I am
22   aware of the Court's concern about flagging cooperation
23   issues in documents that are publicly filed.  And there
24   was a very deliberate choice not to address that in that
25   sentencing memorandum precisely because of that issue.
```

1          THE COURT:  So that is a complicating factor,

2     but when I was giving Mr. Drescher a hard time for not

3     accurately flagging the issues that he was going to call

4     Mr. Biggs to testify, I didn't expect what's good for

5     the goose is good for the gander, and I thought

6     Detective Merchand would either be filling in the blanks

7     of Mr. Biggs' testimony -- yes, he said all these things

8     to the agent -- or talking about Mr. Knowlton or Miss

9     Garay or the application of the firearm enhancement.

10          There is no objection to you eliciting this

11     information, but it wasn't, from the Court's

12     perspective, disclosed as an issue before Court.

13          MS. SHELKROT:  And I would agree.

14          THE COURT:  All right.  So go ahead.

15          MS. SHELKROT:  May I approach, your Honor?

16          THE COURT:  Yes.

17     BY MS. SHELKROT:

18     Q    Detective Merchand, I have just handed you a copy

19     of an application -- or an affidavit in support of an

20     application for a search warrant on the Instagram

21     account with user names jahmoneysp and moneyboss718.

22     Were those Mr. Biggs' and Mr. Brewer's Instagram

23     accounts?

24     A    Yes.

25          THE COURT:  So we will mark this as

1    Defendant's Exhibit B for the record.

2    BY MS. SHELKROT:

3    Q    And if you turn to pages three -- the bottom of

4    page three and page four, you cite a source, an unnamed

5    source, that you have interviewed?

6    A    Yes.

7    Q    And that source was Mr. Williams, wasn't it?

8    A    Yes.

9    Q    So you considered Mr. Williams' information to you

10   sufficiently reliable to include it in an application

11   for a search warrant?

12   A    That and I wanted to keep him anonymous because of

13   the person he was providing the information about.

14   Q    Sure.  Now, you also took statements from

15   Mr. Biggs, correct?

16   A    Yes.

17   Q    You were present during -- present during his

18   proffer and his interviews by law enforcement?

19   A    Yes.

20   Q    Do you recall Mr. Biggs telling you that he tried

21   to kill a guy in 1998 but ran out of bullets before he

22   could do that?

23   A    I remember him talking about running down the

24   street shooting at somebody.  I went -- myself and

25   another agent went through his previous bad acts.

1    Q    And, you know, I have to say, from the redacted

2    statements I have, it's not perfectly clear but it

3    appears to be that there were at least two different

4    shooting incidents that he was personally involved in;

5    is that your recollection?

6    A    Yes, I think there was a second one where he said

7    the gun jammed when he tried to shoot someone.

8    Q    And there was also the incident I asked him about

9    in 2013 when he directed that some people be shot?

10   A    That one I'm a little confused on because there --

11   there was a robbery that took place down in Brooklyn

12   over a -- in the area of the 79th precinct, and he was

13   shot at and robbed, and then there was some people that

14   had talked about retribution for that, and I don't

15   recall if he was directing anyone in that instance or if

16   it was some people that he was affiliated with that were

17   upset that he got shot at and they wanted to go back at

18   him -- back at those guys.

19   Q    Well, as I say, I only have redacted copies of the

20   statements, so I actually don't know the answer for

21   certain.  But I will provide it to you and you can tell

22   me if you can tell from the context what that answer is.

23   Okay?

24   A    Okay.

25            MS. SHELKROT:  So let me just find the right

1    statement.

2          All right.  May I approach, your Honor?

3             THE COURT:  You may.

4    BY MS. SHELKROT:

5    Q    I am bringing you a copy of an FBI investigation

6    dated 9/11/2013.

7             THE COURT:  We will mark this as Defendant's

8    Exhibit C.

9             MS. SHELKROT:  Give me just a moment.

10            (Brief pause.)

11   BY MS. SHELKROT:

12   Q    If you turn to page four of that report.

13   "Mr. Biggs said that he is currently in an ongoing beef

14   with blank, who robbed Biggs for $50,000 in cash, drugs

15   and jewelry."  And you continue down a little bit.  It

16   says, "For retaliation, Biggs has used some crew to

17   shoot some other crew."

18   A    Like I had just said, I believe this was some

19   people that were affiliated with Mr. Biggs that were

20   unhappy with what had transpired.  I don't recall him

21   saying he directed them to go back at 'em.  It was kind

22   of like, He went at our guys so we need to go at them.

23        This is Agent Grubisic's report, who is with the

24   New York FBI, and I was -- and it was him and I

25   interviewing him at that point.  It was after his arrest

1    that evening -- or the following morning, I should say.
2    I don't recall him directing 'em.
3            MS. SHELKROT:  Your Honor, I am a little
4    hamstrung because I don't have the --
5            MR. DRESCHER:  Your Honor, I am looking, in an
6    effort to try and clarify whatever it is Miss Shelkrot
7    is trying to get at here.  I do not have the unredacted
8    report with me.  I guess I would object in a sense that
9    I am not sure where this line of inquiry is going.  Miss
10   Shelkrot obviously cross examined Mr. Biggs at length
11   about various statements.  I believe Mr. Biggs, you
12   know, admitted lots of stuff to her.
13       If it's an effort to impeach Mr. Biggs by proving
14   up a prior inconsistent statement, where the rules of
15   evidence applicable, she could certainly do that.  It's
16   clear Mr. Biggs talked about this episode during one of
17   his interviews, but with regard to the overall issue at
18   here, whether this is going to incrementally -- in a
19   significant way incrementally help the Court assess
20   Mr. Biggs' credibility, I am not sure it does, and I
21   guess I would object on that basis.
22           THE COURT:  So Mr. Biggs testified that he
23   never used violence, and Miss Shelkrot's questions were
24   framed in the form of, Did you tell the agents that you
25   did X?  Did you tell the agent that you did Y?

1          Mr. Biggs sometimes said he did, sometimes said he

2    didn't.  And now she's trying to elicit from

3    Mr. Merchand the other side of the story, and she may do

4    so.

5          You may continue.

6          MS. SHELKROT:  And having said that,

7    your Honor, I am not sure I can really very -- I can't

8    do anything until I get the unredacted version of that.

9    Maybe at some point we can take just a minute and

10   Mr. Drescher could have somebody grab it from his

11   office.

12         MR. DRESCHER:  If I may:  So this is a report

13   of somebody other than Detective Merchand, but of an

14   interview where Detective Merchand was present.  Maybe I

15   have lost track of where we are going here, but I

16   believe Detective Merchand testified as to, you know,

17   what he recalled from this part of the conversation, but

18   perhaps the unredacted report would help.

19         MS. SHELKROT:  I can ask that question.

20         THE COURT:  So let me just say that Detective

21   Merchand has already testified that Mr. Biggs told him

22   that he twice shot at other individuals.  The Court can

23   draw a reasonable conclusion that that's a use of

24   violence.  If you want to go through other statements,

25   you may do so, but I don't see why we would need to get

1    an unredacted statement when we have that acknowledgment
2    from Detective Merchand.  You can decide on that point.
3              MS. SHELKROT:  That's all I have then.  Thank
4    you.
5              THE COURT:  Any cross examination -- redirect?
6              MR. DRESCHER:  No.
7              THE COURT:  All right.  Thank you.  You may
8    step down.
9              THE WITNESS:  Thank you, your Honor.
10             (Witness excused.)
11             THE COURT:  Any further witnesses for the
12   defendant?
13             MS. SHELKROT:  No, your Honor.
14             THE COURT:  All right.  At this point, we will
15   have argument on the existing issues, including the
16   factual challenges, the guideline issues and 3553(a)
17   factors, and what I am going to do is I will start with
18   Miss Shelkrot on all issues, ask Mr. Williams if he
19   wants to make a statement on his own behalf, turn to
20   Mr. Drescher for arguments on all issues, then ask Miss
21   Shelkrot if she wants to make a brief response.  I will
22   rule on the factual issues and make a factual
23   determination, do a guideline calculation, analyze the
24   3553(a) factors, and impose the sentence, and notify the
25   parties of their rights of appeal.

1          Any problem with proceeding in that fashion?

2               MR. DRESCHER:  No.

3               THE COURT:  So no -- any problem, Miss

4     Shelkrot?

5               MS. SHELKROT:  No.  The only question I raise

6     is whether Mr. Drescher intends to introduce any

7     documentary evidence?

8               MR. DRESCHER:  I do not.

9               MS. SHELKROT:  Okay.  So no, no question -- no

10    problems with that.

11              THE COURT:  All right.

12              MS. SHELKROT:  So, your Honor, with respect to

13    the guideline issues first -- sorry.  Trying to organize

14    myself here while I am talking.  I can't do two things

15    at once.

16         With respect to the guideline issues, your Honor,

17    as I noted earlier, the government originally raised the

18    issue of the bag weight and I believe has withdrawn that

19    issue because it appears that Mr. Biggs' testimony was

20    perfectly consistent with the bag weight used by the

21    probation department.  So assuming that that's no longer

22    an issue, I am not going to spend any time on that.

23         The government now is relying on Mr. Biggs', I

24    would say, less-than-clear testimony about how much he

25    was actually supplying to Mr. Williams over a period of

1   time.

2        First of all, there's nothing to corroborate

3   Mr. Biggs' testimony.  The government has interviewed, I

4   would say, probably dozens of witnesses associated with

5   this conspiracy and provided those statements to the

6   probation department, and there's nothing whatsoever to

7   indicate that Mr. Williams was moving over a kilo of

8   heroin.  There's simply -- that statement isn't borne

9   out, and there's nothing that corroborates Mr. Biggs'

10  estimates.

11       Mr. Biggs, by his own estimate, says that there

12  were roughly 30 people, 30-something -- I guess that

13  could be closer to 40 than 30, but 30-something

14  customers who he was supplying in Vermont alone, and

15  Mr. Williams wasn't one of the biggest of them.  He

16  wasn't in the biggest five.  Nobody asked how far down

17  the list he was, but it certainly wasn't one of the top

18  movers.

19       There's no good reason to think that Mr. Biggs has

20  an accurate recollection of how much Mr. Williams was

21  actually moving.  Mr. Biggs essentially admitted as much

22  and he was not able to give any kind of very specific

23  information.  We know that it was quantities of sleeves,

24  hundreds at a time, and we have no dispute with that.

25  That was certainly true.

```
 1          I think Mr. Biggs' own motivation to be dishonest
 2   is evident to the Court.  He has a significant history
 3   of dishonesty both with his criminal record -- and he
 4   himself has stated to the -- stated to the world that
 5   somebody who is cooperating has an incentive to lie.
 6   That's something that he made clear in his own Instagram
 7   post just days before his own arrest in this case that a
 8   rat will do anything to get themselves out of trouble.
 9   I submit to the Court that that's perfectly obvious that
10   that's Mr. Biggs' motivation here.
11          I spent as much time as I did on Mr. Biggs' own
12   conduct because Mr. Biggs has quite a lot of trouble to
13   get out of, considering the scale and scope of his own
14   criminal activity.
15          Putting aside guideline issues for the moment, I
16   would want to turn to the -- the other aspect of this
17   case that I think is -- really ought to be more primary
18   in the Court's mind when the Court's sentencing
19   Mr. Williams, which is his own personal history and
20   characteristics and the 3553(a) factors.
21          Mr. Williams has, in some very challenging
22   circumstances, presented to this Court as somebody who
23   is unusually able and willing under a very difficult set
24   of circumstances to accept the Court's direction, abide
25   by conditions of release, and attempt to change his
```

1        behavior for the better.

2            Mr. Williams appeared in court here in Vermont from

3        Brooklyn I count at least three times:  First when he

4        was arrested and arraigned in June.  He was released

5        from court in New York and sent up here, and he came on

6        his own and showed up in Vermont.  He was here in

7        Rutland at the suppression hearing.  He was here in

8        Burlington for the change of plea.

9            He, as the Court may know, made some fairly

10       extraordinary efforts to comply with the Court's

11       directive in August that he self-surrender to serve his

12       sentence.  I won't go into the details of that because

13       that was a mess.

14            THE COURT:  So let me talk to you about that

15       mess --

16            MS. SHELKROT:  Sure.

17            THE COURT:  -- because I think I made some

18       extraordinary efforts to make sure that Mr. Williams was

19       not inconvenienced.  And the problem with this case --

20       all cases present their own problems -- is I agree that

21       any sentence of imprisonment will be much more difficult

22       for Mr. Williams than somebody who doesn't have his

23       challenges.

24            On the other hand, I have somebody who's driving

25       and doesn't seem to have any difficulty getting up to

1       Vermont and conducting a fairly brisk heroin business.

2       And he knows, because he has been to jail before,

3       that -- you know, not for a long time, but he has a

4       record -- that if he goes to jail, he is going to go in

5       that wheelchair, and it's going to be much more

6       difficult for him than anybody else.

7           So how do I -- how do I balance those factors?

8               MS. SHELKROT:  Your Honor, as a factual

9       matter, I don't think he has ever spent more than 24

10      hours in jail before this instance.  He'd never been

11      more than arrested and released.  That said, there's no

12      question --

13              THE COURT:  Okay.  He is in criminal history

14      category three, and -- and I do recall that he has had

15      mostly suspended sentences and time served.  I guess --

16      I am looking at -- the attempted robbery was two and a

17      half years of imprisonment?

18              MS. SHELKROT:  That's the sentence on which he

19      was just arrested in August.

20              THE COURT:  Okay.  All right.  And then before

21      that, one day of confinement.  Okay.

22              MS. SHELKROT:  I'm pretty sure I'm not

23      misspeaking on that.

24              THE COURT:  I can't really tell because

25      there's two time-served sentences, so I don't know if

1    that's any time or not, but I remember your

2    representation that he served very little time in jail.

3        Let's put it this way then:  He knows that the

4    possibility of jail is there, and yet he embraced this

5    tremendous risk.

6            MS. SHELKROT:  That's certainly right.  And,

7    your Honor, I would not posit that his being in a

8    wheelchair thoroughly excuses all conduct.  I don't

9    think he would say that either.  What it will

10   unquestionably do is make his time in jail significantly

11   more difficult.  And it is true that that is a risk that

12   was -- that was there at the outset.

13       Again, that's -- it's always true that the risk of

14   jail is there and present when somebody commits a crime.

15   I don't think that without having served any time in

16   jail he could have fully appreciated exactly the

17   challenges -- the extra challenges that that would have

18   imposed upon him.

19       This isn't the kind of case where somebody hits a

20   criminal history category three and they have had months

21   here or a year somewhere else or even weeks.  He will

22   face a five-year mandatory minimum sentence here, which

23   is a significant sentence by any stretch of the

24   imagination, without having served any time in jail

25   before.  That's just how it is.  The time that he has

1    been in since his arrest in August on the New York

2    attempted-robbery case is the longest time he has ever

3    spent in jail.

4        So it is true his wheelchair and his incapacity did

5    not prevent him from engaging in criminal activity.  You

6    know, that's obvious or else we wouldn't be here.  And I

7    don't mean to suggest that a sentence of incarceration

8    or more than the minimum term is unnecessary because he

9    is incapable of carrying on any kind of activity, but

10   what I do think is that he has demonstrated to the Court

11   that he has the capacity to the contrary to change.  He

12   has the capacity to abide by the Court's rules and

13   requirements.  He has demonstrated a significant desire

14   to do what the Court wants in this case and has done so

15   at some -- some significant hardship and inconvenience

16   to himself.  And I think that that has -- that speaks

17   well to his ability to adapt and change for the better.

18       It speaks to the amount of incarceration that is

19   necessary in order to achieve a future deterrent effect.

20   He has gotten the message at this point, and in every

21   way that he has been able to since his arrest here,

22   shown -- or since his original indictment, shown the

23   Court that he desires to comply with the court's and our

24   society's rules.

25       This is not a situation where he has been back on

1    violations of conditions of release.  To the contrary,

2    he has appeared for, as far as I know, every single drug

3    test.  He has been tested clean at every single drug

4    test despite the fact he had been a daily marijuana user

5    prior to his arrest, and that's a significant

6    achievement, and it's, as the Court knows, something

7    that we don't see all the time in these cases,

8    particularly where somebody does live far away.

9         It's certainly been my experience that people who

10   are out of state can have kind of a hands-off attitude

11   towards their case.  It can feel a little bit unreal.

12   It's happening up here in Vermont.  They live hundreds

13   of miles away.  It's not part of the daily fabric of

14   things.  It's been my experience in many cases that

15   people don't attend to their criminal cases and don't

16   take them seriously because they're happening way up

17   here in Vermont as opposed to in Brooklyn where the

18   person's living their life.

19        That has not been the case for Mr. Williams.  He

20   has stayed actively engaged and focused on what the

21   Court wants him to do.

22        I had also asked -- and this isn't explicitly a

23   sentencing issue but it is something the Court will need

24   to decide.  I have asked the Court to address the issue

25   of concurrent versus consecutive time for his New York

1   case.  Again, I would point out that the fact that he

2   has not served time before means that he will serve, for

3   this, his first incarcerative sentence, a very lengthy

4   term of imprisonment no matter what.  The very least he

5   can possibly serve is five years from today, and that is

6   a very, very lengthy sentence by any stretch of the

7   imagination.

8        Mr. Williams was a mid-level manager here.  No

9   question that he directed other people, but he was not

10  the engine of this machine.  This machine continued on

11  long after he was done with it.  He wasn't even one of

12  the biggest players of Mr. Biggs, let alone wasn't --

13  wasn't the boss.

14       So this is just not a situation, as Mr. Drescher

15  says, where there are few people more responsible for

16  distribution of heroin in Chittenden County than

17  Mr. Williams.

18       We have the guy who is most responsible for heroin

19  distribution in Chittenden County who just came and

20  testified, and he told us that there are, sounds like,

21  close to half a dozen people he can think of right off

22  the top of his head who are more responsible than

23  Mr. Williams.

24       It's not appropriate to -- and not necessary, in

25  this case, to treat him as somebody who is a -- a major

1     director of criminal activity and somebody who poses a

2     major recidivist risk.

3          So would ask the Court to sentence him to the

4     mandatory minimum of five years and to impose it

5     concurrent with the time he is serving on his state

6     case.

7               THE COURT:  What about your specific guideline

8     challenges?  I didn't hear anything about the firearm

9     enhancement.  I did -- I do take it that you think that

10    he should not receive the same level of enhancement as

11    Mr. Biggs for his role in the offense, and I didn't see

12    any basis for the Court to discount the testimony of Mr.

13    Knowlton and Miss Garay that they, in fact, worked with

14    the defendant.

15              MS. SHELKROT:  Your Honor, Mr. -- Mr. Williams

16    himself can address those issues.  The government has

17    chosen not to present any of those witnesses here, for

18    whatever reasons, either Mr. Knowlton or Ms. Garay or --

19    I'm having a moment with the third one.  Knowlton, Garay

20    or Heffernan.

21         The testimony that Heffernan -- Miss Heffernan

22    provided, that is apparently being used to support the

23    firearm enhancement, is very vague.  It doesn't provide

24    any detail.  It seems to have been -- she seems to have

25    been the only one who gave any kind of information like

1    that, despite, again, quite a number of people.

2              THE COURT:  Well, she's not that vague.  She

3    says -- "Heffernan stated Williams showed her a gun in

4    his belt on two occasions while he was in Vermont.  She

5    has described it as a black pistol, possibly a nine

6    millimeter.  She added that the defendant referred to it

7    as his protection and his body guard."

8              MS. SHELKROT:  Correct.  That is -- that

9    testimony is not consistent with what other witnesses

10   have said, who -- apparently none of the others have

11   said that they have ever seen him with a gun.  Miss

12   Heffernan was involved for a very brief period with

13   Mr. Williams, really just the end of no -- end of 2011,

14   and then she moved on afterwards.

15       I think if Miss Heffernan had actually been here,

16   there would have been significant questions raised about

17   her own credibility and her truthfulness with the Court

18   in general.

19              THE COURT:  But you could have called her.

20              MS. SHELKROT:  That's correct.

21              THE COURT:  Okay.

22              MS. SHELKROT:  That's correct, your Honor.

23       And Mr. Williams is quite emphatic that he had not

24   engaged in drug activity involving Ms. Garay.  There has

25   been no -- no documentary evidence submitted to

1    corroborate that.

2         Mr. Williams' phones were taken; his -- again, not

3    just in February but also in June.  Presumably the

4    government went through those phones and looked for any

5    evidence that would corroborate that.  There hasn't been

6    any documentary evidence to -- or record evidence to

7    corroborate that transaction allegedly involving Ms.

8    Garay.

9         THE COURT:  Anything else before I turn to

10   Mr. Williams?

11        MS. SHELKROT:  I don't think so, your Honor.

12        THE COURT:  All right.  Mr. Williams, did you

13   want to make a statement on your own behalf?

14        THE DEFENDANT:  Yes.

15        First, I want to state I apologize to the state of

16   Vermont, and I take full responsibility to what I did in

17   my behavior, my negative behavior, and I made a bad

18   choice in my life.  And I understand the punishment for

19   the -- for the bad behavior.  And I just want to just

20   get this time over with so I can change my life, do

21   something better, get out and be a better man because I

22   got a family, my mother.

23        And I just go through a lot.  I have lived through

24   a lot in my life that this -- this was a bad choice that

25   I made, and I apologize.  I apologize to you.  I

1    apologize to Michael Drescher, Dan Merchand and his

2    team, the marshals, my lawyer, my family, and I would

3    never do nothing like this again.  And I am not an

4    addict.  I just made bad choices in my life.  I just

5    want to change.

6              THE COURT:  All right.  That's good to hear.

7    Thank you.

8         Mr. Drescher?

9              MR. DRESCHER:  With regard to Mr. Biggs'

10   testimony, Miss Shelkrot indicated she thought there was

11   no corroboration.  I would take issue with that in a

12   sense that -- on several levels.

13        First the PSR itself concludes, based upon culling

14   of data from different independent sources, that

15   Mr. Williams was responsible for distributing around

16   20,000 bags of heroin.

17        Obviously when we're taking information from

18   different -- different data points involved in the

19   conspiracy, we're necessarily going to have an

20   incomplete picture.

21        Even before Mr. Biggs gets on the stand, we have

22   six -- more than 600 grams of heroin accounted for in

23   the PSR, and to suggest that Mr. Biggs' testimony is not

24   corroborated, it fails to recognize the fact that

25   multiple sources of information placed thousands of bags

1    in Mr. Williams' conduct in this conspiracy.

2        With regard to the specifics of his testimony, he

3    said for the last year a low end -- a light purchase

4    would be about five sleeves, a high purchase would be

5    about 15 sleeves.  He estimated about an average of 15 a

6    week.

7        Call it -- or 15 -- 15 sleeves a week over the

8    course of the year before his February arrest.  Call a

9    week 500 -- or call a year 50 weeks for ease of

10   calculation.  15 sleeves over 50 weeks is 750 sleeves.

11   That's well in excess of a kilogram.

12       And I should add -- and so I think there's more

13   than ample evidentiary record in the form of Mr. Biggs'

14   testimony to supply the Court with a record that

15   would -- which would justify and support a guideline

16   finding of more than a kilogram.

17       I think it's unfortunate that we were in a position

18   where we were contesting quantity at all.  Miss Shelkrot

19   has tried to suggest that Mr. Williams has had some sort

20   of extraordinary acceptance of responsibility, and I

21   would suggest that that is simply not the case.  A PSR

22   that very conservatively estimates a guideline quantity

23   of 600-some-odd grams of heroin, Mr. Williams took issue

24   with.  Mr. Williams said he shouldn't be held to be

25   responsible for more than a hundred to 400 grams of

1    heroin.  Somebody who accepts responsibility is going to

2    acknowledge the extent of his -- of his role in

3    distributing heroin in Vermont.

4         In addition, as your Honor pointed out, Miss

5    Shelkrot could have called Miss Garay today.  Miss Garay

6    was -- testified under oath and repeatedly about what

7    she did on Mr. Williams' behalf in March of 2013.

8         In March of 2013, Mr. Williams had already been

9    arrested, had already spent a night or two or three in

10   custody here in Vermont before the initial charges

11   against him were dismissed.  Mr. Williams continued to

12   use his skill managing others in the distribution of

13   heroin even after he had been arrested in Vermont

14   initially.  This is not somebody who is easily deterred,

15   is not somebody who is accepting responsibility.

16             THE COURT:  But you are not asking that he

17   doesn't get acceptance of responsibility?

18             MR. DRESCHER:  Under the guidelines, no.  He

19   should get the three-points credit under the guidelines.

20   But in the -- in the overall -- in the overall

21   sentencing scene, 3553(a) history and characteristics of

22   Mr. Williams, I think that the Court should very much

23   discount and discredit any suggestion that he is here

24   today accepting responsibility for the full scope of his

25   conduct.  Somebody who accepts responsibility does not

1    take unreasonable positions with regard to the

2    quantity -- their quantity admissions.

3          As I say in my -- in the sentencing memo -- I

4    should take another step back.

5          Miss Shelkrot's -- part of her arguments were that

6    he should get special credit for showing up at -- at

7    suppression hearings or showing up to change his plea.

8    I think that's -- that doesn't add up.  That's not a

9    reason to mitigate somebody's sentence simply because

10   somebody appears in court, and I hope the Court rejects

11   that argument.

12         You know, until the warrant on his 2004 property

13   crime that he pleaded guilty to in 2006, was arrested

14   earlier this year, it is true that the PSR indicates

15   that he hasn't spent a whole lot of time in custody, and

16   I think the fairest inference of that is that this is a

17   man who has skirted the law despite several convictions,

18   and having skirted the law, was undeterred about

19   continuing to sell significant amounts of heroin, both

20   personally and by organizing other people in Vermont to

21   do so, and -- and to the extent we credit Miss

22   Shelkrot's argument that, hey, she hasn't been -- he

23   hasn't been -- he hasn't spent a lot of time in custody,

24   therefore he shouldn't get a lot more time in custody, I

25   think the converse of that is it takes a significant

1    period of time in custody to send the signal that

2    somebody who conspires to distribute very large

3    quantities of heroin needs to be deterred, and it takes

4    a long period of time for him to be deterred.

5          And finally, the fact that Mr. Biggs had other

6    customers -- Mr. Biggs sold, by any measure, I believe,

7    and by his admission today, massive quantities of

8    heroin.  And when --

9               THE COURT:  So why is he pleading to a kilo?

10              MR. DRESCHER:  He is pleading to a kilogram

11   for purposes of the 841(a)(1) count.  I am not sure

12   there's a greater quantity he can plead to for -- under

13   the Controlled Substance Act.  That's the largest

14   mandatory minimum threshold.  It would be -- it would be

15   immaterial from an offense perspective for him to plead

16   to 50 kilograms of heroin if one kilo is the threshold

17   there under 841(a)(1).

18              THE COURT:  But often the government agrees to

19   a drug quantity with somebody, and it sounds like a kilo

20   is the tip of the iceberg, by his own admission.

21              MR. DRESCHER:  Absolutely.  Absolutely.  But

22   your Honor's question was, Well, why did he plead to a

23   kilo?  There's not a larger quantity that he can plead

24   to for purposes of triggering a mandatory minimum.  And,

25   you know, by his own count, he was selling a kilo at

1    least every two weeks.

2         Now -- and to that -- to that point, the fact that

3    he has other customers that were buying larger volumes

4    than Mr. Williams, well, hopefully those other customers

5    will have their day in court as well.  But he did say

6    that when Mr. Williams got taken off, yeah, it hurt a

7    little, and it hurt a little because even though he was

8    selling massive quantities of heroin, Mr. Williams was

9    buying a sig- -- enough of that heroin for it to hurt

10   when he -- when that demand was taken away.

11        Ultimately, you know, the quantity issue, I felt

12   like our hand was sort of forced to put that evidence on

13   because Mr. Williams would not acknowledge the full

14   extent of the amount of heroin he sold in this state.

15   So we put it on and --

16             THE COURT:  But the presentence report reached

17   a conclusion.  Probation officer took a relatively

18   conservative approach, and then you contested it.  So we

19   can't -- we can't put that on Mr. Williams.  You said,

20   No, you got it wrong.  Even though there hasn't been

21   many quantities seized and we have controlled buys, I

22   want you to find a higher amount.

23        So how is that Miss Shelkrot's fault?

24             MR. DRESCHER:  It's -- her sen- -- in

25   considering Mr. Williams' characteristics, it -- he

 1    should -- he would be entitled to sentencing credit, I

 2    believe, if he -- if he recognized the full scope of the

 3    crime that he pleaded guilty to.  He pleaded to a

 4    hundred grams.  A hundred grams is 30 sleeves or so, and

 5    that's a small fraction of what he is responsible for.

 6    And the fact that he put the government to its proof,

 7    which is his right, also indicates that he is not

 8    prepared to acknowledge the full extent of his conduct.

 9         Now, it's a guideline issue.  That's why we put the

10    quantity on.  On the one hand, it's a guideline issue,

11    and I think the Court should find it's more than a kilo

12    and the guideline should go up four points as a result.

13    But it's also very much a 3553(a) issue for the reasons

14    I have touched on, to show the nature of his crime, to

15    contrast it with the limited extent of his admissions.

16              THE COURT:  So let me ask you -- because part

17    of the sentencing, by your agreement, is a two-level

18    departure for anticipated changes to the drug quantity

19    table.  Correct?

20              MR. DRESCHER:  Correct.  And so your question

21    is --

22              THE COURT:  Well, my question is --

23              MR. DRESCHER -- what should it come out at?

24              THE COURT:  -- is -- I can understand what the

25    math works out to, but the argument is, you know, he

1    needs to fess up to a larger quantity of drugs but, by

2    the way, we agreed that the drug quantity table is too

3    high and we know that the Sentencing Commission is going

4    to amend it, and so we want you to go down two levels,

5    kind of on the same basis.

6              MR. DRESCHER:  Oh, down two -- well, look.  If

7    we were all in agreement, let's say hypothetically 600

8    grams was right -- we are not in agreement on that, but

9    if that were at -- we would say the guidelines today net

10   out as the PSR indicates, and then we would agree to a

11   two-point variance to account for that because the

12   guidelines are finally catching up to what the practice

13   of the courts in Vermont have been for several years.

14       I am not suggesting the courts -- now they have

15   caught up, there's no reasons why these courts should

16   stay ahead of the guidelines in that regard.  But in --

17   but four points -- whatever the Court nets out, four

18   points should be added as a guideline calculation.

19       Now, if you look at the sentencing memo I

20   submitted, my argument in the end is that a sentence of

21   not less than 108 months is appropriate to send the

22   right signal here.  You add the four points of -- you

23   add the four points of quantity here, that would be a

24   non-guideline sentence.  That would be a variance below

25   where the guidelines would net out.

1          You know, if we add four points, his sentence is --
2     is very, very large.  And I am not suggesting the Court
3     has to impose a guideline sentence even with the kilo to
4     satisfy all of the balancing factors when it comes to
5     sentencing, but I would strongly urge the Court to send
6     a signal to Mr. Williams, to other people tempted to
7     sell heroin in Vermont, in recognition of Mr. Heroin --
8     Mr. Williams' involving many, many people, both New
9     Yorkers who were not addicted, giving them money to come
10    up here, and then exploiting the desperate, cheap labor
11    of the work force that is the heroin-addicted community
12    up here, he got it right.  And maybe he got it right
13    because he doesn't have the physical capabilities of
14    others.  That is the only way he could do it.
15          And it suggests that this is a man that has a lot
16    of potential to do other stuff and to work with people
17    and to manage people.  Unfortunately, he used those
18    skills to sell very large quantities of a drug that has
19    been the scourge on this state for several years now.
20          He didn't live in this state.  He just came up here
21    to spread the poison and take the money out of it.  And
22    the right sentence the Court should impose in this case
23    should be not less than 108 months.
24          Now, with regard to the question of whether
25    your Honor should impose a sentence that your Honor

1    orders be run concurrent or consecutive to the

2    two-and-a-half-year sentence that he's serving right

3    now, I would only suggest that there is no connection

4    between these crimes.  The sentence he is serving now,

5    he's serving because he, for whatever reason, never

6    reported to be sentenced after he pleaded guilty in

7    2006.

8        The suggestion that he be -- that he receive a

9    concurrent sentence on this federal charge to that state

10   charge is akin to having two crimes for the price of

11   one.

12            THE COURT:  Well, but the problem is, as you

13   know, if it runs consecutive, he has to serve that

14   entire sentence, and then the sentence starts, and it

15   takes him way up beyond what you are asking.  So there

16   is no easy way to deal with it.  It's either there's no

17   consequence, when you run it concurrent, or there's a

18   huge consequence when you run it consecutive, and that's

19   just the way it works.

20            MR. DRESCHER:  It's -- it's the way it works.

21   It's a variable your Honor has obviously already

22   considered.  I would urge the Court, in imposing -- in

23   imposing its sentence, that it not let Mr. Williams get

24   two crimes for the price of one.

25        The crime he committed back in New York in 2004, to

1    which he pleaded in 2006, involves working with other

2    people to rob -- to steal the property of -- I believe

3    it was taxi drivers and the like.  It was a property

4    crime of a person with a criminal proclivity.  And he

5    didn't see justice in that case until only recently.

6        That he didn't see justice in that case has kept

7    him on the course to where he is today having sold very

8    large quantities and having -- having inflicted the

9    damage of those quantities of heroin on the state of

10   Vermont.

11       So we ask your Honor impose a sentence of not less

12   than 108 months.  We ask that it be deemed concurrent to

13   his current state charge.

14           THE COURT:  Let me ask you about two things

15   that Miss Shelkrot raised that I haven't heard from you

16   about, and one is substantial assistance.  There isn't

17   going to be a motion in this case, but it remains true

18   that Agent Merchand testified that he used information

19   from Mr. Williams to obtain a search warrant, and that

20   he did provide information, including information about

21   Mr. Biggs, that was corroborated by other individuals

22   and used in this case.

23       And the other is, we have a defendant who is in his

24   70s, or we have a defendant who is 19, or we have a

25   defendant who is Type 1 diabetic.  We take those

1    considerations and those issues into consideration and

2    think about what that sentence is going to mean to that

3    individual.

4         So she says, Look, five years is a long time for

5    anybody.  For somebody in Mr. Williams' condition,

6    there's a multiplier.

7         What do you say about those two issues?

8              MR. DRESCHER:  There's no evidence that the

9    Bureau of Prisons is incapable of accommodating somebody

10   with Mr. Williams' physical condition.  There's no

11   evidence to suggest that Mr. Williams is going to suffer

12   in prison uniquely because he is in a wheelchair.  He

13   suffers generally because he is in a wheelchair, and

14   that's an unfortunate reality.

15        The fact that he is in that -- as your Honor

16   pointed out, that wheelchair's never stopped him from

17   driving or -- did not stop him from driving, did not

18   stop him from getting up here.  He would drive with --

19   he is a very resourceful man, and given that he was shot

20   at the age of 18 and he was paralyzed as a result is sad

21   on many, many, many levels, but it didn't stop him from

22   committing the crime, and unless there's some suggestion

23   that the Bureau of Prisons is incapable of dealing with

24   his physical condition, I don't think it should be a

25   sentencing mitigator.

1     With regard to the question of cooperation,

2     Mr. Williams had an opportunity to sign -- to -- we

3     certainly were interested in whether Mr. Williams wanted

4     to sign a cooperation plea agreement.  To do that, as

5     your Honor knows, you have to do what Mr. Biggs did, and

6     that's basically the full monty.  You have to admit

7     everything you have done, and you have to share

8     information you know.  And he was not willing to do

9     that.

10     So, yeah, he gave some post-arrest statements, and

11     the information in the post-arrest statements tended to

12     be accurate, tended to be true, tended to be deemed

13     reliable, and we used that information in getting the --

14     getting the search warrant together to get into the

15     Instagram accounts.  Yes.  But that happens with lots of

16     people who don't cooperate, and rarely is the fact that

17     somebody gave a post-arrest statement alone a reason to

18     reduce his sentence.

19          THE COURT:  Well, he did more than that,

20     though, right?

21          MR. DRESCHER:  Well, he --

22          THE COURT:  He consented to a search of his

23     cell phone.  I found that the stop itself was unlawful

24     and that, thereafter, he gave false information to a

25     police officer.  So he did more than your average

1  defendant who gets arrested and makes some post-arrest

2  statement; is that fair to say?

3         MR. DRESCHER:  Well, I mean, with regard to

4  the consent of the search of his phones, I mean, the

5  discussion at the time was, Look, if you want to

6  cooperate, you should consent.  You don't have to

7  consent, but -- and if you don't consent, we are going

8  to go get a warrant to look at these phones, and we will

9  go do that.

10     And so it was really the sleeves off his vest to

11  consent because he knew we were going to get into the

12  phones at that point, and I think he rationally said,

13  Okay, you don't have to get a search warrant.

14     You know, we appreciate that, but we could have got

15  the search warrant to get into those phones.  And at the

16  time he was looking to help himself, this being back in

17  February of 2013, and he got the benefit of that -- of

18  that conversation.  He had the charges dismissed against

19  him.  Unfortunately, a month or so later he dispatches

20  Jennifer Garay to come back up here with over a thousand

21  bags of heroin, and it was clear he didn't get it.  He

22  was not somebody capable of working with law

23  enforcement.

24         THE COURT:  All right.  Miss Shelkrot, any

25  brief response?

1          MS. SHELKROT:  Yes, your Honor.

2          To the Court's last point, indeed, the cooperation

3     that Mr. Williams provided was substantially more than a

4     post-arrest statement.  There's a 19-page ROI that

5     details the statements that he made during a proffer

6     session.  Mr. Drescher wasn't there, but it was several

7     hours worth of the information that he provided in that

8     setting to the government.  And as the Court notes, it

9     was used successfully by the government to obtain

10    evidence against somebody who, incidentally, was higher

11    up on the food chain, unlike the unusual, in my

12    experience, situation where Mr. Biggs has been brought

13    in to cooperate against the people that worked for him,

14    which is a fairly extraordinary thing that the

15    government has done here.

16          Mr. Williams, in contrast, provided useful and

17    usable information that was significant in the

18    prosecution of somebody higher on the food chain and

19    also against Jahkim Brewer, who was, at the very least,

20    co-equal and may have been higher on the food chain as

21    well.  I simply don't have those details.

22          The government is asking for a -- an

23    extraordinarily high sentence in this case given what

24    Mr. Williams himself has alleged to have done and given

25    the sentences that have been handed out by this Court in

1   the related cases.  The PSR indicates the sentences that

2   have been given to the related cases.  The highest of

3   those cases is 48 months to Denzlie Boston.  The other

4   sentences range from 24 months -- 24 months, 27 months,

5   35 months, 48 months to Mr. Boston, and then a couple

6   who -- Mr. Knowlton has since been sentenced.  He got 12

7   months.

8        It's really quite remarkable that, given that range

9   of sentences for this cast of characters, Mr. Drescher

10  is asking for a nine-year sentence from somebody who has

11  never served more than a couple days in jail.  There is

12  no question that a serious and significant sentence is

13  warranted here, but I simply do not know how the Court

14  could, on the information that's present, conclude that

15  five-years' incarceration will be insufficient to get

16  across the message and to serve as a deterrent in this

17  particular case under these circumstances.

18       Mr. Williams is not a major, major player.  As I

19  said earlier, he is a mid-level manager and one of many

20  people, unfortunately, who took advantage of the

21  opportunity to come to Vermont and sell heroin through

22  intermediaries.  That doesn't mean that he is entitled

23  to a medal for that behavior, and I am certainly not

24  suggesting that, but I am suggesting that he is not so

25  far out of the mainstream that he deserves a sentence

1    twice that of what his other compatriots are getting.

2              THE COURT:  All right.  The Court's going to

3    begin with the guideline issues, the factual challenges

4    to the guidelines, and the first one is whether Miss

5    Garay and Mr. Knowlton were actually working for the

6    defendant.  There's an argument about that.  There is no

7    factual proffer that has been made in -- in objection to

8    the presentence report.

9         On March 30th, 2013, Miss Garay was arrested.  It's

10   in paragraph 29 and 30 of the presentence report.  She

11   explains that she made the trip to Vermont for

12   Christopher Williams, that she knew as Lay; that

13   Mr. Williams had been trying to convince her boyfriend

14   to transport narcotics for him and he was considering

15   doing it.  She didn't want her boyfriend to get

16   involved.  She made the trip instead.  Mr. Williams was

17   going to handle everything.  She actually provided a

18   fairly detailed statement for her role in transporting

19   the narcotics, and there isn't any reason to believe

20   that she made it up and attributed it to Mr. Williams

21   for the sake of not having anybody else to do it for.

22        Same thing with Mr. Knowlton.  There's a

23   comprehensive statement in the presentence report about

24   his role in the offense.  He admitted that in -- or

25   after the fall of 2011, he became -- began obtaining

1   heroin from an individual he knew as Shawn, who was in a

2   wheelchair, later identified as Christopher Williams.

3   He drives between New York City to pick up a person who

4   works for Mr. Knowlton -- for Mr. Williams.  After they

5   pick up Mr. Williams' worker, they head back to Vermont.

6   They got into an accident.  At that point the worker

7   left the car.

8       Mr. Knowlton, again, his statement is fairly

9   detailed and provides sufficient evidence so that the

10   Court could find by a preponderance of the evidence that

11   he assisted Mr. Williams in the distribution of heroin.

12       With regard to whether or not there is properly a

13   firearm enhancement, we have Miss Heffernan's statement

14   that Williams showed her a gun in his belt on two

15   occasions while he was in Vermont.  She described it as

16   a black pistol, possibly a nine millimeter.  She added

17   the defendant referred to it as his protection and his

18   body guard.

19       The criminal history for Mr. Williams recites that

20   he is well acquainted with weapons and has been known to

21   use them, including firearms, and there isn't any basis

22   on which to challenge Miss Heffernan's statement in

23   terms of its credibility.  So the Court is going to

24   accept those provisions of the presentence report.

25       The defendant makes a further challenge that a

1    four-level role enhancement should be applied, and he
2    argues that the distinction between leadership and
3    organizational roles from mere management or supervision
4    rests on factors, including the exercise of
5    decision-making authority, the nature and participation
6    of the commission of the offense, the recruitment of
7    accomplices, the claimed right to a larger share of the
8    fruits of the crime, the degree of participation and
9    planning or organizing the offense, the nature and scope
10   of the illegal activity, and the degree of control and
11   authority exercised over others.
12          And one of the main arguments is, If I am at a
13   level four, what does that leave for Mr. Biggs?  He
14   should be at an even greater level.
15          The sentencing guidelines recognize that more than
16   one people -- more than one person can qualify for this
17   role enhancement.  And here, the Court agrees that a
18   three-level enhancement, as opposed to a four-level
19   enhancement, properly reflects the fact that
20   Mr. Williams had a number of individuals running drugs
21   for him; that he coordinated their movements and he
22   oversaw that, but he was nowhere near the scale in this
23   very same conspiracy that Mr. Biggs occupied.  So I am
24   going to keep the enhancement but reduce it to a
25   three-level enhancement.

1        The government challenges drug quantity in the

2   presentence report which is based on historical

3   information provided by a number of witnesses that the

4   government put before the grand jury.  And it's a

5   conservative estimate, but the government says it's

6   insufficient to fully reflect the defendant's

7   culpability in this matter.

8        I did not find Mr. Biggs to be a particularly

9   credible witness.  When he advised that he had never

10  used violence, and then later admitted that he shot a

11  gun in a dispute, that he punched somebody unconscious

12  in another dispute, he admitted having a conviction for

13  robbery and a conviction for attempted robbery, I didn't

14  see how that statement could be credible.

15       There were other statements he made as well that

16  the Court found were less than credible, and he conceded

17  he previously provided false information to a police

18  officer on two occasions by giving them a false name.

19       More importantly, he was very vague about drug

20  quantity and repeatedly said it depended on the

21  business; it depended; sometimes it was seven, eight,

22  15; and conceded that when he was asked, before the

23  grand jury, who were his five top customers, in effect,

24  the defendant was not named.  He kept no records of his

25  drug-dealing activity.  There is no independent

1    corroboration of the quantity that Mr. Biggs attributes

2    to Mr. Williams, and he admits he had 30 customers in

3    Vermont that he was supplying, all of which he was

4    keeping track of in his head.

5        So I am not going to increase drug quantity based

6    on the testimony of Mr. Biggs.  The Court accepts the

7    presentence report as its findings of fact in this

8    matter.  The Court begins with a guideline calculation.

9        Pursuant to the decisions in the Supreme Court in

10   United States versus Booker and Gall versus United

11   States, and the Second Circuit Court of Appeals decision

12   in United States versus Crosby, in determining the

13   following sentence, the Court has considered the United

14   States Sentencing Guidelines applicable in this case,

15   including all departure authority contained in the

16   guideline policy statements as well as all the factors

17   enumerated in 18 USC, section 3553(a).

18       The Court finds as follows in this case:

19       The offense of conspiracy to distribute a hundred

20   grams or more of heroin, in violation of 21 USC, section

21   846, 841(a), (b) and (1)(B) occurred from in or about

22   April 2012 to in or about April of 2013, hence the

23   sentencing guidelines apply in this case.

24       The guideline for this offense is found in section

25   2D1.1 of the Guidelines Manual, November 1st, 2013

1    edition.

2         The offense involved at least 400 grams but less

3    than 700 grams of heroin, which results in a base

4    offense level of 28.

5         Specific offense characteristics apply in this

6    case.

7         The defendant possessed a firearm during the

8    instant offense resulting in a two-level increase,

9    pursuant to section 2D1.1(b)(1).

10        The defendant was an organizer or leader of this

11   criminal activity which involved five or more

12   participants, resulting in a three-level increase,

13   pursuant to section 3B1.1(a).  The adjusted offense

14   level is 33.

15        The defendant has demonstrated an acceptance of

16   responsibility for his offense, therefore his offense

17   level is reduced by three levels, pursuant to U.S.

18   sentencing guideline section 3E1.1.  The total offense

19   level is 30.

20        The defendant has five criminal history points

21   resulting in a criminal history category of three.  The

22   guideline range of imprisonment for an offense level of

23   30 in a criminal history category of three is 121 to 151

24   months.  The guideline term of supervised release is

25   four years to life.  Since the offense of conviction

1    expressly prohibits probation, imposition of a term of

2    probation is not authorized.

3         The Court anticipates the proposed amendment to the

4    drug quantity table will become effective on November

5    1st, 2014; as a result, the Court will vary downward two

6    levels, under 18 USC, section 3553(a), to account for

7    this change independent of any other aggravating or

8    mitigating factors that may warrant a variance or

9    departure from the otherwise applicable guidelines.

10        With a criminal history of three and offense level

11   of 28, this results in a sentencing guideline range 97

12   to 121 months.

13        In addition to the sentencing guidelines, the Court

14   looks at the factors under 18 USC, section 3553(a) in an

15   effort to impose a sufficient, but not greater than

16   necessary, sentence.  In deciding what is a sufficient,

17   but not greater than necessary, sentence, the Court

18   examined the nature and circumstances of the offense,

19   the history and characteristics of the defendant, the

20   need for the sentence imposed, the kind of sentences

21   available, the need to provide unwarranted sentencing

22   disparities between defendants with similar criminal

23   histories who committed similar crimes.  So you should

24   not get a sentence that is substantially more harsh or

25   more lenient than somebody who is also in this criminal

1    history category who also commited this crime unless

2    there's a reason for it.  The Court also needs to

3    provide restitution to any victim.

4         In deciding the need for the sentence imposed, the

5    Court is directed to reflect the seriousness of the

6    offense, impose just punishment, protect the public from

7    future crimes by you, impose what we call specific

8    deterrence -- say don't do this again.  It has

9    consequences.  They're very serious ones -- and

10   hopefully you will not be back here.  And also say to

11   the community we are not going to tolerate this.  If you

12   are going to come up to Vermont and sell heroin, you are

13   going to expect to spend a fair amount of time in jail,

14   and hopefully people will be deterred from that

15   activity.

16        The Court also needs to make sure that you get

17   substance abuse treatment, medical treatment, vocational

18   opportunities in the most effective manner possible.

19        In this case, it's hard to understate the damage

20   you did in Vermont, and you have been around enough

21   addicts to know what their lives are like and who they

22   become when they are chasing, in particular, this drug.

23   And a lot of them will tell me, "I lost my soul.  I

24   didn't care about my kids.  I didn't care about my

25   husband.  I didn't care about my job.  I was willing to

1    rip off my grandmother.  I'd do whatever I needed to do

2    to get another drug."

3         And it's the kind of drug that they may be addicted

4    to for the rest of their life, and you know that.  And

5    you were a big distributor.  You are not similarly

6    situated to some of the people who got smaller sentences

7    in this case.  They worked for you.  And you were fairly

8    manipulative and predatory, meaning you used people to

9    accomplish your ends.  You used them and you preyed upon

10   their addiction, and you knew that they would do just

11   about anything to get the next bag of heroin, next hit,

12   and you used that to get them to run drugs, and a lot of

13   drugs.

14        This is -- any -- any description of the drug

15   quantity in this case is conservative because that's

16   probably a small amount of what we know about, and even

17   if we take the most conservative amount, it's still a

18   huge amount of heroin coming into the District of

19   Vermont, and you made it happen.

20        And you were pretty talented in arranging things.

21   You were pretty organized, and you had a lot of people

22   working for you, and that has to be reflected in the

23   sentence, the damage you did, the role you played, and

24   what it did to the community, and what do we say to the

25   community about somebody who inflicted that level of

1    damage.

2        Your history and characteristics.  You're a mystery

3    to me because I think it's really awful that you had --

4    you got caught in the crossfire of shootings twice, and,

5    you know, you have all those consequences, and that

6    wasn't something that you were doing at the time.  It

7    was an environment that you lived in, and here you are

8    with all of that to deal with.  And I am sure it was

9    hard to get jobs and to establish a normal life and not

10   seek the protection of a gang or other people in the

11   situation you were in.

12       You have done well on pretrial release, so I see

13   that potential to turn it around, and it's just a shame

14   that you didn't do it before because you took a terrible

15   situation, something that happened to you that should

16   never happen, and it really didn't stop you at all from

17   shooting at somebody, threatening somebody with a knife,

18   bringing drugs up here, having a firearm, and it's just

19   a mystery as to why not, why -- why you would put that

20   level of risk on you, knowing that if you go to jail,

21   you are going to be going in the wheelchair, and you are

22   going to get better assistance they can provide, but

23   it's going to be a pretty miserable time.

24       And when you and I were at the change of plea and I

25   found out that they had one nurse on duty in Northwest

1    and I thought about you being there for a couple weeks,

2    I thought that that's just going to be a miserable

3    situation for everybody.  You knew that better than I,

4    and you are still running drugs after you get arrested.

5         So I agree that I need to factor in what this

6    sentence is going to be like for you as opposed to

7    somebody without these special challenges, but I wish

8    you had factored that in before you started sending

9    people up here and coming up here with drugs.

10        I think that some consideration should be made for

11   the fact that you provided not only usable information

12   to the government but used information.  You did

13   cooperate to some extent.  The information you provided

14   was truthful, it was corroborated, and they used it, and

15   that is not typical.  That does not happen in every

16   case.  And you shouldn't be penalized because you didn't

17   go the further step.  If you went the further step, they

18   would be asking for a lower sentence.

19        So you are here, but I think that the Court should

20   take into consideration that you did provide usable and

21   used information that was used to secure a conviction

22   against Mr. Biggs who just testified.

23        It's hard to come up with a sentence that's

24   appropriate in this case that balances all of those

25   factors, and it's not that I think that the government's

1    sentencing request is off the charts, but I don't think

2    it fairly reflects both the effort you did do to

3    cooperate and your special circumstances, and so with

4    all of that in mind, I have determined that I am going

5    to increase the time spent in supervised release because

6    I think that we need to protect the public from future

7    crimes by you.  I think this has to be your last crime.

8    And I am going to reduce the sentence, to some extent,

9    to reflect your special circumstances.

10          And I have determined that a sentence of 72 months,

11   followed by a seven-year term of supervised release, is

12   a sufficient, but not greater than necessary, sentence.

13          It is the sentence of the Court the defendant be

14   committed to the custody of the Federal Bureau of

15   Prisons for a term of 72 months, concurrent to any

16   undischarged term of imprisonment, to be followed by a

17   seven-year term of supervised release.

18          The conditions of supervised release are as

19   follows:

20          The defendant shall not commit any crimes, federal,

21   state or local.

22          The defendant shall not possess any illegal

23   controlled substances.

24          The defendant shall abide by the standard

25   conditions of supervision recommended by the Sentencing

1   Commission.

2       The defendant shall refrain from any unlawful use

3   of a controlled substance and submit to a drug test

4   within 15 days of release on supervised release and at

5   least two periodic drug tests thereafter for use of a

6   controlled substance.

7       The defendant shall not possess a firearm or other

8   dangerous weapon.

9       The defendant shall submit his person, property,

10  house, residence, vehicles, papers, computers -- as

11  defined in 18 USC, section 1030(e)(1) -- other

12  electronic communications or data storage devices or

13  media, or office, to a search conducted by a United

14  States probation officer.  Failure to submit to a search

15  may be grounds for revocation of release.  The defendant

16  shall warn any other occupants that the premises may be

17  subject to searches pursuant to this condition.  An

18  officer may conduct a search pursuant to this condition

19  only when reasonable submission exists that the

20  defendant has violated a condition of supervision and

21  that the areas to be searched contain evidence of this

22  violation.  Any search must be conducted at a reasonable

23  time and in a reasonable manner.

24      The defendant shall cooperate in the collection of

25  DNA as directed by the probation officer.

1     The guideline fine range is from 15,000 to $5

2   million.   The defendant has demonstrated an inability to

3   pay a fine, hence all fines are waived.

4     Special assessment of a hundred dollars is imposed,

5   due immediately.

6     Both the defendant and the government may have the

7   right to appeal this sentence as set forth in Title 18

8   U.S. Code, section 3742.  If the defendant is unable to

9   pay the costs of an appeal, he has the right to apply

10  for leave to appeal *in forma pauperis* -- in which event

11  the court would waive the costs of an appeal -- and may

12  request the court to appoint counsel for him.  If the

13  defendant so requests, the clerk of the court shall

14  prepare and file forthwith a notice of appeal on behalf

15  of the defendant.  Notice of appeal by the defendant

16  must be filed within 14 days of the date judgment is

17  entered on the docket, pursuant to Rule 4(b) of the

18  Federal Rules of Appellate Procedure.

19    I would say that I would note with regard to the

20  defendant's objections to the presentence report, that

21  even if I found that the government had an obligation to

22  prove those up, which I do, the Court is entitled to

23  rely on the detailed recitations in the presentence

24  report, which are not challenged in terms of

25  credibility, to support its findings in this matter.

1          Miss Shelkrot, do you have any recommendations as

2     to where Mr. Williams serves his sentence?

3               MS. SHELKROT:  Yes, your Honor.  I'd like to

4     ask that he serve it at Fort Devens.

5               THE COURT:  All right.  Any objection to that?

6               MR. DRESCHER:  No.

7               THE COURT:  The Court recommends that the

8     defendant be incarcerated at Fort Devens.

9          Anything that you need to dismiss, Mr. Drescher?

10               MR. DRESCHER:  Yes.  I ask that the

11     distribution count be dismissed.

12               THE COURT:  Right.  And I assume there's no

13     objection?

14               MS. SHELKROT:  No objection.

15               THE COURT:  It's dismissed.

16          Anything further in this matter?

17               MR. DRESCHER:  Not from the government.

18               MS. SHELKROT:  No, thank you, your Honor.

19               THE COURT:  Mr. Williams, I wish you good

20     luck.  Don't come back because you can't afford to do

21     this amount of time -- this is going to be hard, and I

22     know it -- and have your vision of how things are going

23     to turn out when you get released, and pursue it, and

24     you will do this time, you will rejoin the community,

25     and you will have an opportunity to show us that you

1    mean it when you say you are sorry and this is the end

2    of your criminal activity.

3                 THE DEFENDANT:  Thank you.

4                 (Court was in recess at 5:10 p.m.)

5                         *** ** ***

6

7

8

9                 C E R T I F I C A T I O N

10       I certify that the foregoing is a correct
     transcript from the record of proceedings in the
11   above-entitled matte

12

     November 13, 2014           _____
13   Date                        Anne Nichols Pierce

14

15

16

17

18

19

20

21

22

23

24

25